NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240186-U

NO. 4-24-0186

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 13, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| TRAVIS J. WILEY, | ) | No. 18CF492 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Michael L. Atterberry, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed defendant's conviction of first degree murder, holding: (1) the evidence was sufficient to sustain defendant's conviction, (2) defense counsel provided effective assistance in addressing evidence presented by the State, (3) defendant did not establish plain error or ineffective assistance of counsel in connection with remarks the prosecutor made during closing argument, (4) the trial court properly denied defendant's request for a *Frye* hearing (see *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)), and (5) defendant failed to establish plain error in the way the trial court addressed a note the jury sent during deliberations.

¶ 2    A jury found defendant, Travis J. Wiley, guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)) in connection with the death of A.H., an infant. The trial court sentenced defendant to 35 years in prison. Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) defense counsel provided ineffective assistance in addressing certain evidence presented by the State, (3) the prosecutor committed misconduct during closing argument by disparaging the defense's expert witness, (4) the court should have held a hearing

pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and (5) the court should have investigated a jury note indicating one of the jurors was unfit to serve and render a verdict. We affirm.

¶ 3                                                I. BACKGROUND

¶ 4        On January 20, 2018, A.H., who was just under three months old, stopped breathing while defendant was babysitting her, and she died three days later. The medical examiner who autopsied A.H. concluded she died from abusive head trauma and the manner of death was homicide. The State charged defendant with multiple offenses in connection with A.H.'s death. The State ultimately proceeded on a single count of first degree murder, alleging defendant knew his act of shaking A.H. created a strong probability of death or great bodily harm to her.

¶ 5                                          A. Pretrial Proceedings

¶ 6        Before trial, defendant filed a motion seeking (1) to bar the State from introducing testimony that retinal hemorrhages are indicative of or consistent with abusive head trauma/shaken baby syndrome or (2) to hold a *Frye* hearing on that issue. The basis for defendant's argument was that studies conducted on animals—the closest available proxy for human babies—had not established a link between accelerating/decelerating forces and retinal hemorrhages. The State opposed defendant's motion, maintaining the *Frye* standard was inapplicable because (1) the State's experts would testify based on their medical training and experience, not based on a novel methodology or animal studies, and (2) reviewing courts had held that no *Frye* hearing was required for this type of testimony (see *People v. Schuit*, 2016 IL App (1st) 150312; *People v. Cook*, 2014 IL App (1st) 113079).

¶ 7        At the hearing on defendant's motion, both sides elected to proceed on arguments alone. Defense counsel clarified defendant was not seeking to bar the State's witnesses from

testifying about a diagnosis of abusive head trauma. Rather, defendant wanted to prevent the State's witnesses from discussing retinal hemorrhaging as part of their opinions, given that retinal hemorrhaging had not been correlated to shaking in animal studies. Counsel acknowledged he had no case law or statutory authority supporting his request to bar this testimony. In response to the trial court's questions, defense counsel conceded that (1) retinal hemorrhaging is observable during an autopsy without relying on testing or any particular methodology beyond training and experience; (2) the medical examiner who autopsied A.H. observed both retinal hemorrhaging and other abnormalities; and (3) the State's witnesses would not testify that retinal hemorrhages alone are indicative of abusive head trauma but, instead, would testify about the significance of retinal hemorrhages as "part of a constellation of factors." The prosecutor represented that the State's experts would testify that retinal hemorrhages with no other abnormal findings would not provide a basis to diagnose abusive head trauma.

¶ 8        The trial court denied defendant's motion to bar testimony about retinal hemorrhaging or hold a *Frye* hearing. The court reasoned that the State's experts would testify based on their medical observations, training, and experience, not based on a novel scientific methodology. The court deemed *Cook* and *Schuit* persuasive and binding authority establishing that testimony of this nature does not require a *Frye* hearing.

¶ 9                                B. Trial Evidence

¶ 10        The matter proceeded to trial. We will provide an overview of the evidence here. In the analysis section, we will supplement the facts as necessary to address defendant's claims.

¶ 11                                1. *Uncontested Facts*

¶ 12        A.H. was born on October 25, 2017. There were no prenatal difficulties or complications during the birthing process. Between A.H.'s birth and January 20, 2018, she went

- 3 -

to her pediatrician two or three times for well-baby visits, and there were no indications she was having health problems. About a week before January 20, 2018, A.H.'s mother, Cristina Engle (we will use the last name she provided at trial), observed A.H. holding her breath on one occasion for about five or six seconds. (A police officer testified that Engle once described this to him as an incident where A.H. "stopped breathing.") However, Engle did not feel the need to contact a medical provider about this incident, as she had seen one of her older children do the same thing. In the days leading up to January 20, 2018, Engle perceived no indication that A.H. had any medical issues, aside from teething, fussiness, and constipation associated with switching to a new formula. Engle's parents saw A.H. on January 19, 2018, and likewise discerned nothing concerning.

¶ 13       On January 20, 2018, Engle was scheduled to work from 11 a.m. to 3 or 4 p.m. She arranged for defendant—whom she had known for almost 10 years and had recently moved in with her—to babysit A.H. Engle testified A.H. appeared "perfectly fine" that morning, apart from being "a little fussy." Although Engle told a police officer A.H. was "maybe slightly warm" that morning due to teething or because the weather had warmed up, Engle testified A.H. did not have a fever. As Engle left for work, she told defendant to call her if A.H.'s teething, fussiness, or constipation worsened.

¶ 14       Around 2:40 p.m. on January 20, 2018, defendant called Engle at work and told her A.H. was not breathing. Engle dropped the phone and advised her employer she was going home. As she ran outside, Engle called defendant back and asked him why he had not called 911. Engle hung up on defendant before he could answer this question, and Engle called 911 herself. Emergency personnel were dispatched to Engle's home at 2:42 p.m.

¶ 15       Engle arrived at her home before first responders did. She saw defendant exiting

the residence with a cigarette in his mouth while putting on his jacket. Engle asked where A.H. was, and defendant responded, "[O]h, she's in here." Engle rushed inside and found A.H. in a "Rock n' Play." A.H. was not breathing or moving, and her lips were blue. Engle picked up A.H. and attempted cardiopulmonary resuscitation (CPR) unsuccessfully.

¶ 16       Engle then heard sirens and ran outside with A.H. First responders unsuccessfully attempted to resuscitate A.H. before taking her to Blessing Hospital. Medical providers at the hospital restored A.H.'s pulse within five minutes of her arrival, but she never regained consciousness or breathed independently. A.H. required a higher level of care than could be provided at Blessing Hospital, so she was transferred to Cardinal Glennon Hospital in St. Louis.

¶ 17       Doctors performed multiple laboratory tests and imaging studies over the next few days but could not identify the cause of A.H.'s condition. Although her doctors did not believe she had an infection, they gave her antibiotics prophylactically. A.H.'s condition did not improve, and doctors determined she was brain dead on the night of January 22, 2018. Engle authorized A.H. to be removed from life-supporting measures, and she died on January 23, 2018.

¶ 18       Meanwhile, defendant cooperated and spoke with the police. He reported seeing nothing concerning about A.H.'s behavior on the morning of January 20, 2018, apart from some fussiness associated with constipation. He told the police A.H. seemed healthy and happy when he put her down for a nap around 1:30 p.m. Defendant said he then fell asleep on a nearby couch for 45 minutes to an hour. When he woke up, he noticed A.H. was not breathing and her lips were blue. Defendant claimed he attempted CPR and tried to call 911 multiple times but could not get through. He said he then called Engle. Defendant did not mention to the police whether he called anyone other than Engle or 911 after finding A.H. nonresponsive.

¶ 19       On January 23, 2018, Sergeant Nicholas Eddy of the Quincy Police Department

extracted data from defendant's cellular phone. According to Eddy, between 11:20 p.m. on January 19, 2018, and 10:05 a.m. on January 20, there were 918 "web events" on defendant's phone. At 11:17 a.m. on January 20, there was a "web history event" for a news story about a man sentenced to life in prison for murdering a three-year-old child. After this, there were no "web contacts" until 1:32 p.m. There were an additional nine "web contacts" between 1:32 p.m. and 2:14 p.m. There was an outgoing text message sent from defendant's phone at 1:38 p.m. Eddy mentioned there was "a string of phone calls between 1:31 and 1:38" p.m. However, it seems from Eddy's subsequent testimony he may have been mistaken on that point and these calls were made between 2:31 and 2:38 p.m. Specifically, after viewing a report to refresh his recollection, Eddy testified there were three calls from defendant's phone to Engle's phone starting at 2:31 p.m., three calls from defendant's phone to another individual's phone starting at 2:32 p.m., a call to an ambulance service at 2:32 p.m., and one call to 911 at 2:40 p.m.

¶ 20 When police officers questioned defendant about the news story of the murdered child and the fact that there was phone activity when he claimed he was sleeping, defendant responded that phones do things on their own all the time.

¶ 21 Dr. Peter Williams, a forensic pathologist, autopsied A.H. on January 23, 2018. Dr. Juliette Scantlebury was Williams's supervisor. Williams and Scantlebury saw no signs of external trauma, and all abnormal findings were internal. Williams and Scantlebury submitted A.H.'s brain and eyes for further study. The results of that study did not return for months, delaying the final autopsy report.

¶ 22 While awaiting the autopsy results, the police obtained a warrant authorizing an overhear. An acquaintance of defendant agreed to prompt him to talk about A.H.'s death while the police recorded the conversation. During this overhear, defendant made comments about leaving

town and going to a place where there was no extradition.

¶ 23    Williams and Scantlebury finalized their autopsy report in June 2018, concluding A.H. sustained a closed head injury. Their pathological findings in support of this conclusion were as follows:

"A. Brain, extensive hypoxic-ischemic change with brain death

B. Brain, diffuse axonal injury

C. Brain, pons, multifocal acute intraparenchymal hemorrhage

D. Subgaleal hematoma, left temporoparietal

E. Subdural hemorrhage, diffuse

F. Subarachnoid hemorrhage, diffuse

G. Eyes, bilateral, extensive retinal and optic nerve sheath hemorrhage [and]

H. Optic nerve, diffuse axonal injury."

The State charged defendant with first degree murder on June 29, 2018.

¶ 24    2. *Conflicting Testimony About the Cause and Manner of Death*

¶ 25    The parties' central dispute was the cause and manner of A.H.'s death.

¶ 26    a. The State's Expert Witnesses

¶ 27    The State presented three expert witnesses supporting its theory that A.H. died from abusive head trauma: Scantlebury, Williams, and Dr. Channing Petrak.

¶ 28    Scantlebury testified that all the findings during the autopsy were significant to her conclusion that A.H. died from a traumatic closed head injury attributable to homicide. Nevertheless, the "deciding factor" for Scantlebury was the diffuse axonal injury, which she described as an injury in the white matter of the brain. Scantlebury explained that severing the axon requires "energy" and is not something that happens "trivially" or "naturally." Scantlebury

also believed the damage to multiple layers in both of A.H.'s eyes suggested a traumatic injury rather than a natural condition. According to Scantlebury, the findings from A.H.'s autopsy were inconsistent with a stroke or cerebral sinovenous thrombosis (CSVT). Scantlebury saw no indications that A.H. died from sepsis or any other infection.

¶ 29        Scantlebury testified that A.H. had an "impact site" on her skull, though there was no fracture. Scantlebury opined that it would require "a significant amount of force to cause the findings" noted in A.H. Although Scantlebury did not "know exactly how the trauma was inflicted," she believed a shaking event involving acceleration and deceleration could have been consistent with the autopsy findings. She preferred not to declare a mechanism of injury absent "corroboration for that information."

¶ 30        Williams testified that A.H. died of abusive head trauma attributable to homicide. Although some of the findings Williams observed could potentially occur without trauma, the combination of all the findings and the history available indicated abusive head trauma. Williams believed the extensive hemorrhaging in multiple layers of both of A.H.'s eyes and the diffuse axonal injury to the optic nerve suggested trauma. Williams saw no indications A.H. had a stroke, CSVT, or sepsis.

¶ 31        Williams further testified that, due to the nature of a baby's brain, it would not necessarily require either "extensive" or "exceedingly violent" shaking to inflict trauma. However, "it would have had to have been significant enough to tear the bridging veins." Williams explained it could not be known how long it took for A.H. to lose consciousness after suffering her injury. Williams estimated it "would be minutes to tens of minutes to an hour."

¶ 32        Petrak, a child abuse pediatrician, reviewed medical and law enforcement records and other materials associated with this case. She testified the "totality of the information" led her

to conclude A.H. died from abusive head trauma rather than from natural causes. In Petrak's view, this was not a close case and nothing other than an acceleration/deceleration-shaking injury could explain all the autopsy findings.

¶ 33          On direct examination, the prosecutor questioned Petrak about a journal article the parties refer to in their appellate briefs as the "consensus statement." See Choudhary *et al.*, *Consensus Statement on Abusive Head Trauma in Infants and Young Children*, 48 Pediatric Radiology 1048 (2018). Petrak testified the consensus statement was a reliable document prepared by experts across multiple disciplines after a systematic review of research. According to Petrak, the purposes of the consensus statement were to clarify that (1) abusive head trauma is a medical, not a legal, diagnosis and (2) "many of the alternate theories that get brought up have no evidence base behind them." The prosecutor directed Petrak's attention to numerous assertions from the consensus statement addressing the nature and presentation of abusive head trauma and discounting the viewpoints of physicians who attribute such symptoms to natural causes. As one example, Petrak testified that the consensus statement indicated there was no evidence in the medical literature indicating CSVT could cause symptoms akin to abusive head trauma. On cross-examination, defense counsel directed Petrak's attention to additional assertions in the consensus statement. Defense counsel did not request, and the trial court did not give, a limiting instruction informing the jury it should consider the consensus statement only to evaluate the bases for Petrak's opinions.

¶ 34                          b. Defendant's Expert Witness

¶ 35          Dr. Jane Turner, a forensic pathologist who operated a consulting business, testified for the defense that A.H. died of natural causes. Specifically, A.H. contracted pneumonia that developed into sepsis as her body overreacted to fight it; as part of this process, A.H. also

developed CSVT and disseminated intravascular coagulation, and blood clots traveled to her brain, causing a stroke. Turner testified this process began before January 20, 2018, but became "critical" that day. As the overarching basis for her opinions, Turner explained that A.H.'s medical records from her hospitalization and the microscopic slides taken during the autopsy showed A.H. died from natural causes.

¶ 36 On cross-examination, the prosecutor highlighted that Turner's report prepared before trial did not include many of the details and medical terms she mentioned during her testimony. Turner further acknowledged there have been other occasions in her consulting work where she opined a child died from the same disease progression she believed killed A.H. For example, in one recent criminal case that also involved an infant who was treated at Blessing Hospital, Turner presented the same opinion and charged $22,487 for her work. She had been authorized by the trial court to receive more than $12,000 for her work in connection with the present case.

¶ 37 The prosecutor also questioned Turner about the consensus statement. Turner disagreed with some of the propositions in the consensus statement. She noted the consensus statement failed to cite animal studies and that none of its authors were forensic pathologists. Turner opined that abusive head trauma is a controversial diagnosis, notwithstanding what the consensus statement declared. In her view, one cannot diagnose abusive head trauma from an acceleration/deceleration injury absent neck injuries, which A.H. did not have. Turner acknowledged that when she previously worked as a medical examiner in St. Louis, she concluded perhaps two or three dozen times that children died of abusive head trauma. She explained her experience over the years had caused her to question how she was trained about the nature of injuries from shaking an infant.

¶ 38                          3. *Verdict, Sentencing, and Notice of Appeal*

¶ 39           The jury found defendant guilty of first degree murder. The trial court denied defendant's posttrial motion and sentenced him to 35 years in prison. Defendant filed a timely notice of appeal.

¶ 40                                II. ANALYSIS

¶ 41                           A. Sufficiency of the Evidence

¶ 42           Defendant first challenges the sufficiency of the evidence. Specifically, he contends the State failed to prove that (1) A.H.'s injuries resulted from abusive head trauma, (2) he caused those injuries, and (3) he acted with the requisite *mens rea*. In support of his arguments on the first two points, defendant cites secondary sources, such as medical journals—which were not introduced at trial—to challenge the science underpinning the opinions of the State's experts.

¶ 43          The State responds that the evidence was sufficient to sustain defendant's conviction and we should disregard the materials defendant cites that were not introduced at trial.

¶ 44          To determine whether the evidence was sufficient to sustain a defendant's conviction, a reviewing court considers "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "This standard of review applies in all criminal cases, whether the evidence is direct or circumstantial." *People v. Jackson*, 2020 IL 124112, ¶ 64. In conducting our review, we must respect that the jury was responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences. *Jackson*, 2020 IL 124112, ¶ 64. We accord great deference to the jury's "decision to accept testimony." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). "Testimony may be found insufficient under the *Jackson* standard, but only where the

record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280.

¶ 45     As an initial matter, the State properly objects to defendant augmenting the trial evidence by relying on secondary sources to establish medical facts about abusive head trauma. See *People v. Cline*, 2022 IL 126383, ¶ 32 (explaining that a review of the sufficiency of the evidence "must be limited to evidence actually admitted at trial"). In his reply brief, defendant indicates that he cites secondary sources "not as new evidence, but rather to provide further context for the issues with [abusive head trauma] as a diagnosis, as raised by trial counsel below through the request for a *Frye* hearing, the accompanying studies, and Dr. Turner's testimony." Defendant also directs our attention to instances where the United States Supreme Court and the Illinois Supreme Court cited secondary sources in their opinions. Defendant's attempt to pass off new evidence as "context" for his sufficiency-of-the-evidence argument is misguided. None of defendant's cited cases referenced secondary authorities as part of evaluating a sufficiency-of-the-evidence claim on direct appeal. Accordingly, when considering whether the evidence supported defendant's conviction, we will limit ourselves to the facts adduced at trial.

¶ 46     Section 9-1(a)(2) of the Criminal Code of 2012 provides that a person commits first degree murder by killing an individual without lawful justification if, in performing the acts causing the death, "he knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(2) (West 2018). Here, defendant first challenges the State's proof that A.H. died from abusive head trauma.

¶ 47     The State's expert witnesses—Scantlebury, Williams, and Petrak—each explained in detail why they concluded A.H. died from a closed head injury/abusive head trauma attributable to homicide. They also testified why they ruled out natural disease, such as sepsis or a stroke. In

contrast, defendant's expert, Turner, opined that A.H. died from a natural disease progression. It was the jury's duty to determine which testimony to believe. See *Schuit*, 2016 IL App (1st) 150312, ¶ 123 ("[T]he weight to be assigned to an expert opinion is for the trier of fact to determine in light of the expert's credentials and the factual basis of the opinion."). This is not a case where "the record evidence compels the conclusion that no reasonable person could accept" the testimony of the State's experts regarding the cause of A.H.'s death. *Cunningham*, 212 Ill. 2d at 280.

¶ 48        Defendant cites cases where reviewing courts or dissenting justices recognized that the science underpinning abusive head trauma has evolved over the years and that there is some controversy within the medical community regarding when or if this diagnosis is warranted. See, *e.g.*, *Cavazos v. Smith*, 565 U.S. 1, 13-15 (2011) (Ginsburg, J., dissenting, joined by Breyer and Sotomayor, JJ.); *Del Prete v. Thompson*, 10 F. Supp. 3d 907, 957 n.10 (N.D. Ill. 2014). However, once again, none of the cases defendant cites included such commentary in an analysis of a sufficiency-of-the-evidence challenge on direct appeal. Here, the jury heard competing testimony from the witnesses about A.H.'s condition and the nature of abusive head trauma. The jury was entitled to credit the State's experts.

¶ 49        Defendant further contends that A.H. exhibited signs of "medical distress" in the days before January 20, 2018. Defendant reasons that (1) A.H. was fussier than usual, (2) Engle observed A.H. stop breathing at one point, and (3) Engle told the police A.H. was running a temperature. However, a rational trier of fact could have found that A.H. did not show signs of medical distress before January 20, 2018. The evidence showed she had a normal birthing process, and her pediatrician did not identify any serious health conditions during well-baby visits. The jury could have believed A.H.'s fussiness on and before January 20, 2018, was attributable to teething and constipation, rather than a fatal disease progression. The jury also could have reasonably

credited Engle's testimony that A.H. (1) once held her breath momentarily but did not stop breathing and (2) did not have a fever on January 20, 2018. Moreover, defendant's argument about medical distress does not comport with his own statement to the police that A.H. was healthy and happy when he put her down for a nap.

¶ 50    Defendant next challenges the State's proof that he caused A.H.'s injuries. As part of this argument, defendant notes (1) no witness saw him abuse A.H., (2) he previously babysat A.H. without incident, (3) there was no evidence he had ever been short-tempered or abusive toward A.H., (4) Engle never expressed concern about defendant being alone with A.H., and (5) other individuals had contact with A.H. in the days before her death.

¶ 51    Notwithstanding the points defendant raises, the jury reasonably found that defendant caused A.H.'s injuries. On January 19, 2018, A.H. appeared normal to her grandparents. A.H. also seemed normal to Engle before 11 a.m. on January 20, 2018. Defendant was alone with A.H. for multiple hours on January 20 before she became nonresponsive. The jury reasonably credited the State's experts' testimony that A.H. suffered a traumatically inflicted injury. The jury also could have believed Williams's estimate that A.H. would have lost consciousness within "minutes to tens of minutes to an hour" after suffering her injuries, which means the injuries occurred under defendant's watch. Thus, there was a reasonable basis in the evidence for the jury to conclude defendant inflicted the injuries leading to A.H.'s death.

¶ 52    Defendant finally challenges the State's proof that he knew his acts created a strong probability of death or great bodily harm to A.H. "The factual determination of whether defendant acted knowingly *** may be inferred from the circumstances surrounding the incident, defendant's conduct, and the nature and severity of the victim's injuries." *People v. Coleman*, 311 Ill. App. 3d 467, 473 (2000). To that end, "medical testimony of severe and violent injuries to a baby victim

can provide circumstantial evidence from which a trier of fact can infer that defendant knew his conduct created a strong probability of death or great bodily harm." *Coleman*, 311 Ill. App. 3d at 477. Here, Petrak testified that A.H.'s injuries were severe. Scantlebury testified that A.H.'s diffuse axonal injury required "energy" to occur and was not something that would happen "trivially" or "naturally." Scantlebury further testified that it would require "a significant amount of force to cause the findings" noted in A.H. We recognize that another State expert, Williams, testified it would not necessarily require either "extensive" or "exceedingly violent" shaking to inflict trauma to a baby. Nevertheless, there was a valid basis in the evidence for a reasonable jury to deduce that defendant used a degree of force on A.H. he knew was drastically excessive for an infant. The jury was not required to accept the theory, first articulated on appeal, that defendant may have merely "jostled A.H., not realizing how susceptible infants can be to shaking injuries."

¶ 53        As part of assessing the *mens rea* requirement, the jury also could have deemed defendant's inaccurate explanation to the police about the events immediately preceding A.H.'s death as consciousness of guilt. See *People v. Walker*, 2020 IL App (4th) 180774, ¶ 93 (noting that lying to the police may be construed as consciousness of guilt). The data extracted from defendant's phone supported an inference that he was awake when he claimed he was sleeping. The jury was not required to believe defendant's explanation to the police that phones do things on their own all the time. Moreover, although defendant never admitted guilt in connection with A.H.'s death, he made an unusual comment during the police overhear about going someplace where he could not be extradited. The jury was entitled to consider whether that statement likewise reflected consciousness of guilt.

¶ 54        Accordingly, we hold that the State proved the elements of first degree murder beyond a reasonable doubt.

¶ 55                    B. Allegations of Ineffective Assistance of Counsel

¶ 56          Defendant next argues that his counsel performed deficiently in two distinct respects. For the sake of clarity, we will address defendant's claims separately.

¶ 57          To obtain relief based on ineffective assistance of counsel, a defendant must show both that trial counsel performed deficiently and that such deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the deficiency requirement, the United States Supreme Court has cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that the challenged action was sound trial strategy. *Strickland*, 466 U.S. at 689. Given *Strickland*'s mandate to accord deference to attorneys' decisions, "[s]trategic choices are virtually unchallengeable." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 62.

¶ 58          As to *Strickland*'s second requirement, prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 59                    1. *The News Article About the Murdered Child*

¶ 60          Defendant first criticizes his counsel for failing to "rebut the State's mischaracterization of the evidence that [he] performed a 'search' on his cell phone for a news article about the murder of a young child on the morning of the incident." In support of this

- 16 -

argument, defendant asserts that although Eddy, who extracted data from defendant's phone, expressed "hesitance to say that the article had been accessed as the result of an internet search," the prosecutor "repeatedly mischaracterized the web contact as the result of a 'search' " during Eddy's direct examination. Defendant acknowledges his counsel "did push back a little on the idea that the article was accessed through a search." Nevertheless, defendant proposes counsel "did not do so adequately." According to defendant, rather than attempting to establish during cross-examination that defendant's phone might have accessed this article on its own accord, counsel should have explored the possibility that defendant clicked on an article someone sent to him or which "popped up as a notification from an app."

¶ 61        The State responds that Eddy's testimony "clearly supports the State's argument that a search was made by defendant on his phone." The State also notes that by attempting to establish on cross-examination that defendant's phone may have accessed this news article on its own accord, defense counsel mirrored the explanation defendant gave to the police. The State emphasizes there was no evidence that someone sent this news article to defendant or that it " 'popped up as a notification from an app.' " Thus, the State maintains defense counsel provided effective assistance.

¶ 62        We hold that defendant has not demonstrated his counsel performed deficiently in addressing the news article about the murdered child. It was a reasonable inference from the evidence presented that defendant conducted a Google search for this article, so the prosecutor did not misrepresent the evidence. Specifically, although Eddy generally referred to the presence of this news article on defendant's phone as a "web history event," Eddy also testified that in his experience, "it's a Google search for that website." Defense counsel questioned Eddy about whether this article could have somehow gotten on defendant's phone without user input, such as

by an automatic news feed. Although defendant now argues this was not the strongest way of addressing the evidence, counsel's questioning was consistent with defendant's statement to the police that the phone accessed this article autonomously. The record reflects counsel's performance was reasonable in addressing the article consistently with defendant's statements to the police. Because defendant cannot establish his counsel performed deficiently, we need not consider whether he was prejudiced by counsel's actions.

¶ 63                                    2. *Use of the Consensus Statement*

¶ 64          Defendant also contends his counsel was ineffective for failing to "challenge the State's use of the consensus statement on abusive head trauma to improperly bolster the testimony of the State's expert witnesses." Defendant argues the consensus statement was "inadmissible hearsay and its introduction violated [his] right to confrontation." Although he concedes "scientific reports are generally considered non-testimonial" for purposes of the confrontation clause, he proposes the consensus statement was testimonial because it was "specifically geared towards prosecuting defendants accused of inflicting [abusive head trauma]," insofar as it discredited defense experts' opinions. According to defendant, the State's reliance on the consensus statement during its direct examination of Petrak and cross-examination of Turner "effectively used the [consensus] statement as an additional expert witness to testify against [defendant]." Defendant also notes the prosecutor relied on the consensus statement during closing argument to discredit Turner's opinions. Ultimately, defendant maintains his counsel should have either (1) objected to the State's use of the consensus statement or (2) requested that the jury be provided Illinois Pattern Jury Instructions, Civil. No. 2.04 (approved Dec. 8, 2011) (hereinafter IPI Civil No. 2.04), which would have told the jury not to consider the consensus statement as substantive evidence.

¶ 65          The State responds that it is proper for an expert to testify about the facts or data

- 18 -

forming the basis for his or her opinion, even if such facts or data would otherwise not be admissible. The State also observes that a party may cross-examine an expert with the contents of a treatise another expert has testified is authoritative. The State further notes courts have criticized IPI Civil No. 2.04 as being confusing. Thus, the State submits, "It is likely defense counsel decided not to request [that instruction] as a matter of trial strategy so as not to further draw the jury's attention to the damaging information contained within the consensus report."

¶ 66        We begin with defendant's claim about a confrontation-clause violation. The sixth amendment to the United States Constitution (U.S. Const., amend. VI) guarantees a criminal defendant the right to confront the witnesses against him or her. However, only hearsay evidence that is "testimonial" in nature falls within the scope of the confrontation clause. *Smith v. Arizona*, 602 U.S. 779, 800 (2024). "A statement is testimonial when its 'primary purpose *** is to establish or prove past events potentially relevant to later criminal prosecution.' " *People v. Palomera*, 2022 IL App (2d) 200631, ¶ 32 (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006)). The consensus statement was not testimonial in nature, as it was published before defendant was charged with A.H.'s murder and the assertions therein were not intended to prove past events for the purpose of defendant's prosecution. See *Smith*, 602 U.S. at 800 n.5 ("[T]he mine-run of materials on which most expert witnesses rely in forming opinions—including books and journals, surveys, and economic or scientific studies—will raise no serious confrontation issues," as they lack an evidentiary purpose.). Accordingly, the State's use of the consensus statement at trial did not implicate the confrontation clause.

¶ 67        Apart from the alleged confrontation-clause violation, defendant also argues that the assertions in the consensus statement were hearsay. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth

of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Notwithstanding the hearsay rule, expert witnesses may testify about "underlying facts and data, not admitted into evidence, for the purpose of explaining the basis" of their opinions. *People v. Lovejoy*, 235 Ill. 2d 97, 142 (2009); Ill. R. Evid. 703 (eff. Jan. 1, 2011).

¶ 68        Petrak testified on direct examination that the consensus statement was "relied upon by physicians in [her] field." She asserted she was familiar with the consensus statement, considered it reliable, and used it to guide her practice. She then testified to various assertions in the consensus statement that were consistent with her experience. Under these circumstances, the State's method of using the consensus statement during Petrak's direct examination was justified by the rule allowing experts to explain facts and data underlying their opinions.

¶ 69        Furthermore, there was no problem with the way the State used the consensus statement in its cross-examination of Turner. "[C]ross-examination of an expert with reference to a recognized text or treatise is proper where either the court has taken judicial notice of the author's competence [citation] or, absent concession by the witness, the cross-examiner proves the text or treatise is authoritative." *People v. Johnson*, 206 Ill. App. 3d 875, 879 (1990). A party may prove the competence of a treatise through the testimony of "a witness expert in the subject." *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 336 (1965). Petrak testified that she considered the consensus statement reliable and used it to guide her practice. Accordingly, it was permissible for the State to use the consensus statement during its cross-examination of Turner.

¶ 70        For these reasons, defense counsel would not have succeeded had he objected to the State's use of the consensus statement at trial based on either a confrontation-clause violation or a violation of the hearsay rule. Accordingly, these portions of defendant's ineffective-assistance claim fail, as counsel did not perform deficiently. See *People v. Bradford*, 2019 IL App (4th)

170148, ¶ 14 (stating that if an objection would have been futile, the defendant cannot establish ineffective assistance of counsel).

¶ 71    The only remaining issue is whether defense counsel was ineffective for failing to request the jury be instructed with IPI Civil 2.04, which provides:

> "I am allowing the witness to testify in part to [books] [records] [articles] [statements] that have not been admitted in evidence. This testimony is allowed for a limited purpose. It is allowed so that the witness may tell you what he/she relied on to form his/her opinion[s]. The material being referred to is not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you will give the opinions testified to by this witness."

Although this instruction is designed for civil trials and there is no pattern criminal analogue, our supreme court has suggested a limiting instruction of some sort might be appropriate in criminal trials where an expert testifies to the bases for his or her opinions. See *People v. Anderson*, 113 Ill. 2d 1, 12 (1986) (explaining that a limiting instruction can prevent the jury from considering testimony as substantive evidence).

¶ 72    We hold that defense counsel did not perform deficiently. One factor we consider is that defense counsel may have wanted the jury to consider portions of the consensus statement that were favorable to the defense as substantive evidence, which could explain the lack of a request for a limiting instruction. For example, counsel elicited testimony from Petrak that the consensus statement said a changing history raises concerns for possible abusive head trauma. Given that the jury knew defendant remained consistent in his account of the events of January 20, 2018, defense counsel was evidently insinuating that defendant's conduct did not raise concerns

pursuant to the consensus statement. Defense counsel also established on cross-examination of Petrak that the consensus statement provided that "no single injury is diagnostic of [abusive head trauma]." This was helpful to the defense because it showed none of A.H.'s abnormal findings were inherently characteristic of abusive head trauma. Defense counsel further elicited testimony from Petrak that the consensus statement cautioned: "Each infant suspected of suffering [abusive head trauma] must be further evaluated for other diseases that might present with similar findings. The question to be answered is[,] [I]s there a medical cause to explain the findings or did this child suffer from inflicted injury?" Considering that Turner opined that A.H. died from a disease process, this aspect of the consensus statement helped the defense by acknowledging disease can produce findings similar to abusive head trauma.

¶ 73          Although the jury heard about other aspects of the consensus statement that were unfavorable to the defense, in evaluating counsel's performance, we also consider that counsel emphasized during closing argument the controversy regarding the nature of abusive head trauma. Specifically, counsel argued (1) the consensus statement was created without the input of forensic pathologists and (2) the National Association of Medical Examiners no longer takes a position on the topic of "pediatric head trauma and homicide."

¶ 74          Furthermore, we consider that the First District has recognized IPI Civil No. 2.04 can be a confusing instruction, as it is logically incoherent to ask a jury to evaluate the bases underlying an expert's testimony without considering whether those underlying bases are true. *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 78. Thus, it is conceivable that defense counsel here believed IPI Civil No. 2.04 might be more confusing to the jury than helpful to the defense, particularly where counsel may have wanted the jury to consider some assertions in the consensus statement as substantive evidence.

¶ 75    Defendant faces a high hurdle in arguing his counsel performed deficiently. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and defendant must overcome the presumption that counsel pursued a sound trial strategy. *Strickland*, 466 U.S. at 689. Under the circumstances, we cannot say defense counsel's failure to request IPI Civil No. 2.04 fell outside the wide range of professional assistance. Because defendant has failed to meet the deficient-performance requirement of *Strickland*, we need not consider whether he sustained prejudice in connection with the consensus statement.

¶ 76    C. Alleged Prosecutorial Misconduct

¶ 77    Defendant next contends the State "engaged in prosecutorial misconduct during closing argument by making over-the-top disparaging remarks about Dr. Turner, the defense's expert witness, intended to inflame the passions of the jury." Defendant acknowledges he forfeited this issue, as he did not object to any of these comments at trial and raise this issue in a posttrial motion. However, defendant asserts that (1) we may review the issue pursuant to the plain-error doctrine and (2) defense counsel was ineffective for failing to object to the remarks. The State maintains the prosecutor's remarks "were proper in all respects."

¶ 78    We note that defendant presents no meaningful analysis as to why the subject comments by the prosecutor implicate either the plain-error doctrine or ineffective assistance of counsel. After arguing that the prosecutor made comments critiquing Turner that exceeded the bounds of permissible advocacy and served to inflame the jury's passions, defendant tacks the following sentence on to the end of this section of his brief: "While trial counsel failed to preserve this error for review by objecting during trial and including it in a post-trial motion, this Court can and should still review this issue as either ineffective assistance of counsel (*see supra*, pages 37-

- 23 -

38) or plain error (*see infra*, pages 49-50)." Defendant's cross-references to other portions of his brief obfuscate rather than clarify his position about plain error and ineffective assistance of counsel. On pages 37 to 38 of his brief, in the context of arguing he was prejudiced by his counsel's deficient methods of addressing the news article and the consensus statement, defendant argues the evidence was closely balanced. Pages 49 to 50 of defendant's brief address plain error in connection with an alleged due process violation relating to the trial court's failure to investigate a jury note during deliberations. Specifically, on page 49, defendant invokes the first prong of the plain-error doctrine in a one-sentence argument that refers the reader back to pages 37 and 38 of the brief. On pages 49 to 50, defendant contends the due-process violation relating to the jury note constituted second-prong plain error because it deprived him of his right to a trial by an impartial jury.

¶ 79 It is not clear from the briefs whether defendant is asking us to review the prosecutor's allegedly improper comments pursuant to the first prong of the plain-error doctrine, the second prong, or both. We should not have to guess about the nature of an appellant's arguments. See *People v. Inman*, 2023 IL App (4th) 230864, ¶ 13 (" 'A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.' ") (quoting *People v. Macias*, 2015 IL App (1st) 132039, ¶ 88)). Defendant's incorporation of an ineffective-assistance analysis pertaining to completely different issues is likewise insufficient and unhelpful to this court.

¶ 80 Under the circumstances, we would be justified in holding defendant forfeited his argument about prosecutorial misconduct and then moving on to the next issue. However, as defendant has indeed identified some improper remarks by the prosecutor, we will consider his

argument. Additionally, during oral argument, defendant's appellate counsel clarified that defendant invokes the first prong of the plain-error doctrine.

¶ 81        "Generally, prosecutors have wide latitude in the content of their closing arguments." *Jackson*, 2020 IL 124112, ¶ 82. It is proper for a prosecutor to comment on the evidence and reasonable inferences drawn therefrom, "even if the suggested inference reflects negatively on the defendant." *Jackson*, 2020 IL 124112, ¶ 82. A prosecutor may also "comment on the credibility of witnesses so long as it is based on an inference which might logically be drawn from their demeanor or testimony." *People v. Sanders*, 198 Ill. App. 3d 178, 186 (1990). However, "[a] prosecutor cannot use closing argument simply to 'inflame the passions or develop the prejudices of the jury without throwing any light upon the issues.' " *People v. Wheeler*, 226 Ill. 2d 92, 128-29 (2007) (quoting *People v. Halteman*, 10 Ill. 2d 74, 84 (1956)).

¶ 82        To preserve the issue for appellate review, a defendant must contemporaneously object to the prosecutor's remark and then raise the issue again in a posttrial motion. *People v. Mudd*, 2022 IL 126830, ¶ 21. A defendant may attempt to avoid procedural default by invoking the plain-error doctrine or arguing ineffective assistance of counsel. If a prosecutor's comments do not implicate the plain-error doctrine, a related ineffective-assistance claim necessarily fails, too. See *Jackson*, 2020 IL 124112, ¶ 91 (explaining a defendant could not show "prejudice" for purposes of an ineffective-assistance claim where the court had already determined the subject comments did not constitute prosecutorial misconduct under a plain-error analysis). Thus, we will begin by considering whether the plain-error doctrine applies.

¶ 83        The plain-error doctrine is "a narrow exception to the rule of procedural default for unpreserved errors." *People v. Williams*, 2022 IL 126918, ¶ 48. To obtain relief pursuant to the first prong of the plain-error doctrine, a defendant "must show that the evidence was closely

balanced and that the prosecutor's comments were clear or obvious reversible error that changed the outcome of the trial." (Internal quotation marks omitted.) *Mudd*, 2022 IL 126830, ¶ 22. Commentary during closing argument constitutes reversible error "only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Jackson*, 2020 IL 124112, ¶ 83. In other words, to establish prejudice, a defendant alleging first-prong plain error must show that the prosecutor's improper comments had "some probable bearing on the result" and were damaging enough to severely threaten to tip the scales of justice against the defendant. *Williams*, 2022 IL 126918, ¶ 57.

¶ 84       The first step in a plain-error analysis is to determine whether the prosecutor made improper comments that would have constituted reversible error had the issue been preserved for appeal. *Williams*, 2022 IL 126918, ¶ 49. Here, the prosecutor had the right to critique Turner's testimony and to argue she was biased in favor of criminal defendants. As the State notes, the evidence showed Turner routinely served as a compensated expert witness for defendants, she offered the same opinions in other cases, her views on abusive head trauma changed over time, and her opinions might represent a minority viewpoint among physicians. The impropriety here is not the broad points the prosecutor made to critique Turner but how he made them.

¶ 85       For example, the prosecutor's sarcastic accusation that Turner would attribute a shooting to natural causes or lead poisoning was unwarranted. There was also no basis in the evidence for the prosecutor to claim that Turner had only one report she used for all her cases in which she served as an expert witness. Moreover, the prosecutor inappropriately compared Turner to doctors paid by the tobacco industry who relied on research sponsored by that industry, as there was no basis in the evidence to support that analogy. It was also improper for the prosecutor to refer to Turner's opinions as "junk offered for cash." See *People v. Moss*, 205 Ill. 2d 139, 170-71

- 26 -

(2001) (explaining that calling the defendant's experts " 'cash for trash doctors' " was "completely unacceptable"). There was likewise no justification for the prosecutor to claim Turner was making A.H. her "victim." Our supreme court has "strongly condemned" comments like these denigrating a defendant's expert witnesses. *Moss*, 205 Ill. 2d at 171.

¶ 86        Although the prosecutor made improper comments, defendant faces a high bar to obtain relief on this issue. Again, to obtain relief pursuant to the first prong of the plain-error doctrine, defendant "must show that the evidence was closely balanced and that the prosecutor's comments were clear or obvious reversible error that changed the outcome of the trial." (Internal quotation marks omitted.) *Mudd*, 2022 IL 126830, ¶ 22. As mentioned previously, although defendant references a different section of his brief where he discusses the closely balanced nature of the evidence, he presents no argument as to whether the improper comments constituted clear or obvious reversible error that changed the outcome of the trial.

¶ 87        Our review of the record convinces us that the subject comments did not constitute clear or obvious reversible error that changed the outcome of the trial. We reiterate that most of the comments were improper, not because of their broader points, but because of how the prosecutor made them. There is no reason to suspect the prosecutor's invective misled or confused the jury or had some other "probable bearing on the result." *Williams*, 2022 IL 126918, ¶ 57. We note the trial court cautioned the jury that (1) the lawyers' arguments were not evidence and (2) it should disregard statements by the lawyers not based on reasonable inferences from the evidence. See *Jackson*, 2020 IL 124112, ¶ 87 (explaining a reviewing court may consider whether the trial court told the jury to disregard statements not based on the evidence). Under the circumstances, defendant is not entitled to relief under the first prong of the plain-error doctrine.

¶ 88        Because defendant has failed to demonstrate his entitlement to relief under the

plain-error doctrine, we must reject his related ineffective-assistance claim for the same reasons. See *Jackson*, 2020 IL 124112, ¶ 91. Despite this, we expect prosecutors will refrain from making similar inappropriate remarks in future cases.

¶ 89                                D. Request for a *Frye* Hearing

¶ 90            Defendant also argues that the trial court erred in denying his request for a *Frye* hearing. The State asserts that the testimony of its experts was not subject to *Frye*, as the testimony was based on the witnesses' training, experience, and observations, rather than a scientific methodology.

¶ 91            In Illinois, the *Frye* standard governs the admission of scientific evidence. *In re Detention of New*, 2014 IL 116306, ¶ 25. The standard is codified in Illinois Rule of Evidence 702 (eff. Jan. 1, 2011):

> "Where an expert witness testifies to an opinion *based on a new or novel scientific methodology or principle*, the proponent of the opinion has the burden of showing the methodology or scientific principle on which the opinion is based is sufficiently established to have gained general acceptance in the particular field in which it belongs." (Emphasis added.)

The purpose of *Frye* is "to exclude new or novel scientific evidence that undeservedly creates 'a perception of certainty when the basis for the evidence or opinion is actually invalid.' " *New*, 2014 IL 116306, ¶ 26 (quoting *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 78 (2002), *abrogated on other grounds by In re Commitment of Simons*, 213 Ill. 2d 523, 530 (2004)). We review *de novo* a trial court's decision as to whether the circumstances require a *Frye* hearing. *New*, 2014 IL 116306, ¶ 26.

¶ 92            "Because *Frye* applies only to scientific evidence," the initial step in our analysis

is to determine whether the State's experts' opinions were based on "scientific evidence subject to the *Frye* standard." *People v. McKown*, 226 Ill. 2d 245, 254 (2007); see *Cook*, 2014 IL App (1st) 113079, ¶ 48 (providing that when a party requests a *Frye* hearing, the "threshold issue" is whether the challenged testimony is scientific evidence). Generally, "scientific evidence" for purposes of *Frye* means evidence that is "the product of scientific tests or studies." *McKown*, 226 Ill. 2d at 254. Notably, "the *Frye* test does not concern an expert's ultimate conclusion but, instead, focuses on the underlying scientific principle, test, or technique used to generate that conclusion." *New*, 2014 IL 116306, ¶ 28.

¶ 93 Here, defendant requested a *Frye* hearing on a rather narrow issue. He focused on whether the State's experts should be allowed to testify that A.H. sustained retinal hemorrhages, given that retinal hemorrhaging had not been correlated to shaking in animal studies. However, defense counsel conceded at the hearing on this motion that (1) retinal hemorrhaging is generally observable by medical examiners without relying on special testing or any particular methodology beyond training and experience; (2) the medical examiners who autopsied A.H. observed both retinal hemorrhaging and other abnormalities; and (3) the State's witnesses would not testify that retinal hemorrhages alone are indicative of abusive head trauma but instead would testify about the significance of retinal hemorrhages in conjunction with other clinical findings. Defendant did not challenge whether abusive head trauma is a medically valid diagnosis, nor did he seek to prevent the State's witnesses from testifying that A.H. sustained abusive head trauma. Defendant merely questioned the link between one of A.H.'s abnormal findings and the conclusion that she sustained abusive head trauma.

¶ 94 We hold that the trial court properly denied defendant's request for a *Frye* hearing, as the State's experts did not rely on any scientific methodology or principle with respect to retinal

hemorrhaging beyond observation and experience. See *New*, 2014 IL 116306, ¶ 28 ("[W]hen an expert opinion is derived solely based upon observation and experience, that opinion is generally not considered scientific evidence subject to the *Frye* test.") (citing *In re Marriage of Alexander*, 368 Ill. App. 3d 192, 197 (2006)). This is not a case like *New*, for example, where the defendant broadly challenged whether a certain purported disorder was "a diagnosable mental condition based upon legitimate scientific principles and methods." *New*, 2024 IL 116306, ¶ 33. Here, defendant challenged the link between retinal hemorrhaging and abusive head trauma, not whether abusive head trauma is itself a diagnosable condition. Nor is this case like *McKown*, where the State relied on the results of a specific scientific mechanism—a horizontal gaze nystagmus test— to prove the defendant was impaired by alcohol. *McKown*, 226 Ill. 2d at 255. Under the circumstances presented, the State's experts' opinions were not based on scientific evidence about the connection between retinal hemorrhaging and abusive head trauma, so *Frye* was not implicated.

¶ 95 On appeal, defendant broadens his *Frye* challenge by disputing the body of science underlying abusive head trauma generally, seemingly questioning whether it is a valid diagnosis. Although the State does not invoke forfeiture, the claim could be made that defendant forfeited his argument to the extent he broadens the scope of his challenge on appeal. Nevertheless, we note that the First District has considered and rejected requests to hold a *Frye* hearing to explore the science underpinning abusive head trauma and shaken baby syndrome. See *Schuit*, 2016 IL App (1st) 150312, ¶¶ 78-99; *Cook*, 2014 IL App (1st) 113079, ¶¶ 46-53. In summary, the First District reasoned, much as we do, that an expert's opinions based on observations and experience do not implicate *Frye*.

¶ 96 Defendant cites *People v. Petak*, 2024 IL App (5th) 220641-U, an unpublished

decision in which the Fifth District ordered a *Frye* hearing to explore the link between retinal hemorrhages and abusive head trauma. We determine *Petak* is factually distinguishable from our case. In *Petak*, the specific *Frye* issue the defendant raised was "whether retinal hemorrhage was a definitive sign of abusive head trauma." *Petak*, 2024 IL App (5th) 220641-U, ¶ 6. Elsewhere in the disposition, the appellate court framed the issue as whether the trial court erroneously denied a *Frye* hearing "on the issue of whether a finding of retinal hemorrhage was a sufficient basis to diagnose shaken baby syndrome." *Petak*, 2024 IL App (5th) 220641-U, ¶ 2. Here, by contrast, the State's experts never claimed retinal hemorrhaging was a definitive sign of abusive head trauma, nor did they suggest retinal hemorrhaging was a sufficient basis by itself to indicate inflicted trauma. Furthermore, *Petak*'s analysis of the *Frye* issue missed an important step. In our view, the *Petak* court erroneously considered whether there was "general acceptance" without addressing the threshold question of whether testimony of this nature was subject to *Frye* in the first place. See *Petak*, 2024 IL App (5th) 220641-U, ¶¶ 44-46.

¶ 97                                      E. Jury Note

¶ 98          Finally, defendant argues he was denied a fair trial because the trial court "failed to investigate a note from the jury sent out during deliberation indicating that one of the jurors was unfit to serve and render a verdict in this case." Defendant recognizes he forfeited this issue by failing to raise it below, but he asks us to review the matter pursuant to both prongs of the plain-error doctrine.

¶ 99          The State responds that the trial court properly replied to the jury's note and that defendant has failed to establish he was prejudiced in connection with this issue. According to the State, the "record does not establish that any juror was unqualified to serve."

¶ 100         The following additional facts are relevant to this issue. The jury retired to

deliberate at 11:02 a.m. on November 17, 2023. During deliberations, the jury submitted multiple notes containing numerous questions, and the parties and the trial court agreed on language responding to many of those questions. However, neither the jury's notes nor the court's written responses are included in the record on appeal. What we know about the jury's notes and the responses comes from the report of proceedings.

¶ 101          Specifically, at 1 p.m., the jury sent a note asking three questions about the law and evidence. The parties and the trial court agreed on finalized written responses to those questions, but the record does not reflect the time that occurred. At 3:15 p.m., the jury sent a note asking what it should do if it could not come to an agreement. At 3:48 p.m., the parties and the court agreed on a finalized written response informing the jury "to continue to deliberate and review the evidence and the instructions." At 3:49 p.m., the jury submitted at least five more questions. One question was: "Issues with juror understanding words and has memory issues. What can we do with this issue?" The court indicated it would "need some clarification on exactly what's being asked" before responding to this question as posed, as it was not clear whether a juror had a genuine physical or mental-health concern. Before addressing any other pending questions, at 4:13 p.m., the parties and the court agreed to ask the jury in writing "whether there is a juror who, because of a mental or physical condition, is unable to continue to serve as a juror." The parties then went off the record to engage in a discussion. At 4:28 p.m., the jury informed the court it had reached a verdict. The jury found defendant guilty of first degree murder. Defense counsel requested the jury to be polled, and all the jurors indicated this was then and is now their verdict. After the court discharged the jury, the court documented for the record that the jury reached a verdict before responding to the court's question about whether any juror had a mental or physical condition preventing him or her from continuing to serve as a juror.

¶ 102          On appeal, defendant invokes the plain-error doctrine, so our initial inquiry is whether he has established a clear or obvious error. *People v. Bush*, 2023 IL 128747, ¶ 71. Defendant frames the issue as a due-process challenge, and many of the cases he cites involve juror bias, inattentive jurors, or jury tampering. However, there is no hint in the record that any juror was biased or inattentive or that there was an improper influence on the jury. Rather, defendant's specific claim is an unknown juror may have been unfit to serve, and the trial court should have taken further action when that issue presented itself during deliberations.

¶ 103          We hold that the record does not show a clear or obvious violation of defendant's due-process rights. Defendant contends the jury note the trial court received at 3:49 p.m. raised concerns about whether a juror was fit to serve. But the language of the note was vague and might simply reflect frustration that one juror had a different opinion about, or recollection of, the evidence than other jurors. That interpretation of the note seems more probable considering the jury had recently indicated it was having trouble reaching an agreement. Nevertheless, the record shows the court and the parties took steps to ensure there was no issue about a juror being unfit to serve by asking the jury a question at 4:13 p.m. Defendant maintains it is unclear from the record whether the court's question "was ever sent back to the jury." However, after discharging the jury, the court documented for the record that it "inquired about" the possibility of a juror being unfit and the jury reached a verdict "before the Court received an answer to that question." Thus, the court obviously believed the jury had received the court's question sent at 4:13 p.m., and there is no basis in the record for us to speculate to the contrary. Importantly, the plain-error doctrine addresses clear or obvious errors appearing on the record, so a defendant cannot meet his or her burden through speculation. See *People v. Manskey*, 2016 IL App (4th) 140440, ¶ 82 (noting that plain errors are errors that "just about leap off the pages of the record").

¶ 104　　　　　As mentioned above, most of the cases defendant cites bear no factual resemblance to this case and involve distinct legal issues. The most relevant case defendant cites is *People v. Hayes*, 319 Ill. App. 3d 810 (2001). In *Hayes*, the foreperson sent a note during deliberations asserting that a fellow juror said during deliberations that he primarily spoke Spanish and did not " 'understand the English testimony.' " *Hayes*, 319 Ill. App. 3d at 814. In response to this note, the trial court questioned the specified juror and "confirmed that [he] had significant difficulty understanding English and that he could not adequately follow the evidence presented." *Hayes*, 319 Ill. App. 3d at 814. Although the defendant moved for a mistrial based on these events, the court elected to replace the specified juror with an alternate juror, and the jury found the defendant guilty. *Hayes*, 319 Ill. App. 3d at 814-15. The appellate court affirmed the decision to replace the specified juror rather than declare a mistrial. *Hayes*, 319 Ill. App. 3d at 817.

¶ 105　　　　　*Hayes* is factually distinguishable, as it involved a note from the jury indicating a specified juror could not understand English. Here, by contrast, the jury submitted a vague note that did not mention any individual juror. Defense counsel agreed to respond in writing with a question inviting the jury to clarify whether there was any concern about a juror's fitness to serve on the jury. Rather than replying to this note by reciting specific concerns, the jury soon reached a verdict. All jurors then confirmed their verdict. Ultimately, the parties—who had the opportunity to observe the jurors during jury selection, the trial, and polling—did not request additional questioning of the jurors about the 3:49 p.m. note. The trial court likewise did not deem it necessary to initiate questioning *sua sponte*.

¶ 106　　　　　We deem the trial court's actions reasonable under the circumstances. The premise of defendant's argument is that the court "failed to investigate" the subject jury note, but the record contradicts that claim. The court recognized a potential issue about whether a juror was unfit to

serve, worked with the parties to address that potential issue, and gave the jury the opportunity to explain whether there was an actual issue. The jury's subsequent conduct suggests the jury did not believe there was an issue regarding any juror's fitness to serve. Defendant has failed to demonstrate a clear or obvious violation of his due-process rights. Thus, he is not entitled to relief pursuant to the plain-error doctrine.

¶ 107                                  III. CONCLUSION

¶ 108          For the reasons stated, we affirm the trial court's judgment.

¶ 109          Affirmed.