# Illinois Official Reports

## Appellate Court

---

### *People v. Hsiu Yan Chai*, 2014 IL App (2d) 121234

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HSIU YAN CHAI, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-12-1234 |
| Filed | August 19, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for criminal trespass to real property and resisting a peace officer based on an incident in which defendant was escorted out of a state motor vehicle license facility by police after becoming angry, his trespass conviction was reversed and his conviction for resisting a peace officer was upheld, since the State failed to prove that defendant received notice from "an owner or occupant" of the facility that his entry into the facility was forbidden, but defendant admitted that he committed the physical acts of placing his hands on a door to prevent being pushed out and being slow to offer his hands for cuffing, even though he argued that he did not "intend" to resist the officers by doing so. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 11-CM-5414; the Hon. Bruce R. Kelsey, Judge, presiding. |
| Judgment | Reversed in part and affirmed in part. |

Counsel on
Appeal

Thomas A. Lilien and Barbara R. Paschen, both of State Appellate
Defender's Office, of Elgin, for appellant.

Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman
and Edward R. Psenicka, Assistant State's Attorneys, of counsel), for
the People.

Panel

JUSTICE JORGENSEN delivered the judgment of the court, with
opinion.
Presiding Justice Burke and Justice McLaren concurred in the
judgment and opinion.

**OPINION**

¶ 1    Following a November 2011 incident at the Department of Motor Vehicles (DMV) in Lombard, the State charged defendant, Hsiu Yan Chai, with: (1) criminal trespass to real property (in that the DMV manager had previously provided Chai with notice that he was not to return to the DMV) (720 ILCS 5/21-3 (West 2010)); (2) resisting a peace officer (720 ILCS 5/31-1(a) (West 2010)); (3) obstructing a peace officer (720 ILCS 5/31-1(a) (West 2010)); and (4) disturbing the peace (720 ILCS 5/26-1 (West 2010)). After a juror's repudiation of a guilty verdict as to criminal trespass, and the jury's sending three notes to the court that it was deadlocked, the jury ultimately convicted Chai of criminal trespass to real property and resisting a peace officer. It acquitted Chai of obstructing a peace officer and disturbing the peace. The court sentenced Chai to 20 days in jail for each conviction, to be served concurrently, and one year of conditional discharge.

¶ 2    Chai appeals, arguing, as to criminal trespass, that: (1) the evidence was insufficient to convict; (2) trial counsel was ineffective for allowing the court to give an improper deadlock instruction; and (3) the court committed plain error when it refused to answer the jury's question on a point of law. We agree that the evidence was insufficient, because the State presented no evidence that an owner or occupant of the DMV provided Chai with notice that he was never to return to the property. Further, there was no evidence from which a rational juror could infer that an owner or occupant asked, explicitly or implicitly, the police to order Chai never to return. We decline to extend case law to allow a police officer, rather than an owner or occupant, to provide notice to the defendant under the circumstances of this case. Therefore, we reverse Chai's conviction of criminal trespass and do not reach the latter two arguments. As to resisting a peace officer, Chai argues that the trial court erred in refusing to answer certain jury questions. We reject that argument and affirm the conviction of resisting a peace officer. We thus reverse in part and affirm in part.

## I. BACKGROUND

Chai, age 62 at the time of the present incident, has been a United States citizen since 1994. In the 18 years before the incident, he was convicted of one misdemeanor charge of criminal trespass. He has a degree from "MIT" (presumably the Massachusetts Institute of Technology). However, he works in a restaurant. Chai's proficiency in English was at issue in this case, and Chai used a Mandarin-speaking interpreter throughout the proceedings. The evidence adduced at trial concerned two incidents at the DMV. The first took place in September 2011, and the second took place in November 2011 and culminated in the four charges against Chai.

### A. The September Incident

On September 1, 2011, Chai went to the DMV to help a friend obtain a driver's license. Following a disagreement that is not detailed in the record, Chai began speaking in an angry manner to DMV employees. As a result, DMV security called the police. Officers Thomas McElroy and Ericson (who did not testify and whose first name is unclear from the record) escorted Chai outside and, according to McElroy, told him not to return.

Four witnesses testified concerning the September incident. These witnesses were DMV security guard Jeanette Ferguson, DMV manager Joseph Calafiore, McElroy, and Chai.

Ferguson made the decision to call the police. She testified:

"Q. And when the police arrived, did you say anything to the defendant once the police arrived?

A. No. I let the–I explained to the police officer what was going on and let them just, basically, kind of take control of it then. I just explained that–the situation as to what had previously occurred.

Q. Okay.

A. The reason why I had to call for him–for them to come to assist me.

Q. And was–to the best of your knowledge, was the defendant ever told not to come back to that facility?

A. Oh, yes.

DEFENSE COUNSEL: Objection, foundation.

THE COURT: She may answer.

Q. So he was told not to come back; is that correct?

A. Yes.

Q. And now, Ms. Ferguson, bring your attention back to *** November 23 ***." (Emphasis added.)

Calafiore observed the police remove Chai from the facility, and he spoke with the police after Chai left the premises. He testified:

"Q. After everything happened in the facility on September 1, what was the result of it?

A. He was escorted outside by the Lombard Police.

Q. And were there any instructions given to the defendant?

A. I was inside. I was told afterwards that he was–

DEFENSE COUNSEL: Objection.

THE COURT: Sustained as to what you were told. If you can repeat what you personally did or said at that time.

A. I inquired with the Lombard police as to what happened, and they told me that–

DEFENSE COUNSEL: Objection.

THE COURT: Just a second. You can indicate what you did but not what the officers told you at this point.

A. Okay. Just inquired as to what they did.

THE STATE: I'll rephrase my question, Judge.

THE COURT: Please.

Q. Was the defendant welcome to return to that facility?

A. No.

Q. Now, let's go to November 23 of 2011."

¶ 10    McElroy testified:

"Q. And, Officer, while you were at the DMV [on September 1], what happened?

A. We were told that–

[The court sustained a hearsay objection.]

Q. Officer, as a result of your arrival to the DMV, was [Chai] asked not to come back?

A. He was told not to come back.

Q. And who actually told him not to come back?

A. Officer Ericson.

DEFENSE COUNSEL: Objection, hearsay; objection, foundation.

COURT: Overruled. His answer will stand.

Q. Were you present when the defendant was told that he was not welcome to come back?

A. Yes.

Q. Did he say anything to you or to the other officer when he was told not to come back?

DEFENSE COUNSEL: Objection, relevance.

THE COURT: You may answer.

A. I don't–he didn't say anything directly to me, I wasn't the reporting officer on the first incident though. I didn't do that report. Officer Ericson did, so he didn't say anything to me directly.

Q. But, eventually, he left the premises; is that correct?

A. Yes.

Q. So, now coming back to November 23 ***."

McElroy did not testify as to any further details regarding the oral notice not to return. No written notice was given.

- 4 -

¶ 11    Chai denied that McElroy and Ericson ever told him not to return to the DMV. Rather, according to him, they asked him where he worked, he told them he worked down the street at "Mr. Wonton's," and they told him to return there.

¶ 12                        B. The November Incident

¶ 13    A few months later, on November 23, 2011, Chai returned to the DMV. This time he accompanied his wife, who was hoping to obtain her first driver's license. She had been a United States citizen for less than one year, her English was weak, and she needed help navigating the system. Chai's wife had already passed the written portion of the test. Chai and his wife sat in the DMV for 40 minutes, waiting to be called for the road test. When it was Chai's wife's turn, they went outside and drove their car behind the DMV facility, where the test would begin. The instructor told Chai to wait inside the DMV. As Chai was leaving the car, he heard the instructor begin to talk to his wife, telling her to turn on various lights and turn signals. Chai saw that his wife was able to follow the instructions. Chai waited in the DMV as told. After about 15 minutes, an employee called him to the counter. The employee informed him that his wife could not take the road test because she did not sufficiently understand English. After some back-and-forth dialogue, the employee called Calafiore. According to DMV employees, by this point, Chai had become "irate" and "hostile." For example, Ferguson testified that defendant was screaming, "It's not fair! It's not fair!"

¶ 14    Calafiore testified that Chai confronted him with a "high level" of profanity. Chai spoke broken English, but Calafiore was able to understand him. Calafiore asked Chai to sit in the waiting area. Chai got up several times, but he sat back down when Calafiore so instructed. Calafiore recognized Chai as the man who had caused the September disturbance, and, so, he called the police. When the police arrived, they asked Calafiore if he wanted Chai to be arrested, and Calafiore said yes.

¶ 15    McElroy and Officer Eric Gouty responded to the scene. McElroy also recognized Chai from the September incident. He conceded that, when he arrived, Chai was sitting peaceably in the waiting area. He told Chai that he was under arrest and asked Chai to walk outside. Chai cooperated. As is common practice, McElroy put his hands on Chai's arm and shoulder area to guide him outside. (Chai believed that McElroy pushed him outside, rather than guided him.) When they were in the six-foot-wide vestibule area leading to the outside, Chai stopped moving forward, put his hand on the outer door, and turned around. He shouted something in Mandarin to his wife, who was still inside the DMV. McElroy considered this behavior hostile and uncooperative.

¶ 16    According to McElroy and Gouty, when Chai stopped moving forward and put his hand on the outer door, McElroy twice told Chai to remove his hand from the door. When Chai did not comply, but, rather, continued yelling to his wife, McElroy purposely used his knee to strike Chai in the buttocks. This was a standard technique to keep a suspect moving forward. In the same series of movements, McElroy also grabbed Chai's torso. This caused McElroy and Chai to go tumbling out the door. Chai landed on the sidewalk, face down, with his hands underneath his body. McElroy was on top of Chai. McElroy told Chai three or four times to give him his hands and to "stop resisting." McElroy then grabbed Chai's hands from underneath his body and placed Chai in handcuffs. McElroy estimated that 7 to 12 seconds

elapsed from when McElroy first told Chai to give him his hands to when he had Chai in handcuffs.

¶ 17    Chai, in contrast, testified that, when he placed his hand on the outer door to turn around and say something to his wife, McElroy struck his head from behind. This caused them to go tumbling to the sidewalk. Chai put his hands in front of his body because he was trying to break his fall. He acknowledged that McElroy asked him for his hands three or four times and told him to stop resisting. He explained that he did not want to struggle but that the struggle occurred as a result of the fall:

"Q. What happened after the policeman used his fist to punch you?

A. Because I wasn't even aware that was coming, so I fell down. And then he was on top of me ***. *** [M]y hand was in front as I was falling down trying to protect myself. So the policeman was using a lot of force to try to put my hand–put my hand behind my back. And I was struggling. And I heard the policeman said stop struggling. To be honest, it's really–I don't want to struggle. Otherwise, there is no way they can have my arm behind my back, so I let them do that and they helped me get up."

Chai further stated that, as a result of being pushed to the ground by McElroy, he sustained a gash to his forehead. When he finally stood up, he could "feel the blood going, keep on coming down."

¶ 18    Regarding Chai's injury, McElroy and Gouty corroborated that Chai sustained a head wound for which he was taken to the hospital. Pictures of the head wound were submitted into evidence. Outside the presence of the jury, Chai's attorney sought to raise the affirmative defense of self-defense to the charges that Chai resisted and obstructed a peace officer. The court denied the request, stating that self-defense does not apply where a defendant knows that he is interacting with police officers.

¶ 19    The State asked Chai if he was aware that McElroy and Gouty were police officers. Chai did not answer the question. The trial court excused the jury and told Chai that he must answer the question. When the jury returned, Chai answered, "yes," he knew that McElroy and Gouty were police officers.

¶ 20    Finally, when defense counsel asked Chai if he understood that he was not welcome at the DMV when he entered the DMV in November, he answered: "Why is it I cannot go in? What's the reason I cannot go?" When the State asked the same question, Chai answered: "I do not understand why I cannot enter." Chai believed that he should be able to enter the DMV, because he is a United States citizen entitled to certain services.

¶ 21                    C. Argument, Deliberation, and Sentencing

¶ 22    During closing arguments, the State discussed the alleged notice not to return: "The defendant denies he was told [not to return]. A credible officer's testimony tells us that the defendant was on September 1 *** told not to return to the facility." The defense did not object to the State's characterization of the officer as "credible." Instead, during its closing, the defense responded that, in the context of this case, the vague statement that, in September 2011, an officer told Chai "not to return" to the DMV did not sufficiently prove that Chai *knew* he was not welcome at the DMV in November 2011:

"Mr. Chai did not understand that he was ever told not to come back to that facility. And the police officer, who is sitting in court, Officer McElroy, he actually told you, well, I didn't put it in writing. *** So [Chai] couldn't possibly take something in writing and maybe ask someone else that is a fluent English speaker what it said, what restrictions were on it.

There was no testimony of any restrictions. For example, there was no testimony that, well you can't go back there for the next 30 days, you can't go back there for the next year, you can't go back there for your lifetime.

It is completely unreasonable to ban someone [from the DMV] for a lifetime, so there must have been some restriction, but there was no testimony about that at all."

¶ 23 After closing arguments, the jury engaged in two rounds of deliberations. In the first round, as is relevant to this appeal, the jury asked the trial court to define various elements in the instructions. Specifically, it asked the court to explain the difference between "resisting" and "obstructing." It also asked: "What does knowingly mean? Does the defendant have to understand what was said to him?" Outside the presence of the jury, the court jokingly stated to the attorneys that it did not understand the difference between "resisting" and "obstructing" itself. The court made no specific comment about the "knowingly" question. The court responded to the questions by stating that the jury already had the instructions that apply to this case.[1]

¶ 24 The jury returned and indicated that it had reached a verdict on all four counts. The verdict forms indicated not guilty on the disorderly-conduct and obstruction charges and guilty on the criminal-trespass and resisting charges. The defense requested that the jury be polled as to the guilty verdicts. The court polled each juror and the first six jurors confirmed their verdicts. The seventh juror repudiated the criminal-trespass verdict. The seventh juror was never asked about the resisting verdict, and the remaining five jurors were not polled at all. Instead, the court ordered the jury to deliberate anew on all four charges. If it was unable to reach a verdict "shortly," deliberations would resume the next day. Indeed, the jury was unable to reach a verdict "shortly."

¶ 25 The next day, in the second round of deliberations, the jury sent the trial court a note stating that it did not "expect to ever reach agreement on all four charges."[2] Upon receiving the note, the court and the parties agreed to give Illinois Pattern Jury Instructions, Civil, No.

---

[1]The State suggests that the trial court never received the "knowingly" question. We are not persuaded by this suggestion. The handwritten question is in the record, photocopied on the same page as the "resisting"-versus-"obstructing" question. It is hard to imagine how it got there if the judge never saw it. Moreover, the transcripts reflect that the trial court stated, "As to the last *two* questions, they have instructions." (Emphasis added.) We know that one of the questions the court referred to was the "resisting"-versus-"obstructing" question, because it joked about it. The only logical inference is that the second question was the "knowingly" question.

[2]The record contains two other notes sent by the jury: "We are deadlocked on the two remaining charges. We don't expect to ever reach a unanimous agreement," and "We reached agreement on one charge. We are deadlocked on the second." However, the timing of these other notes, including the deliberation round during which they were sent, is not clear from the record, because the transcripts contain no discussion of them.

1.06 (Supp. 2008) (hereinafter, IPI Civil (Supp. 2008) No. 1.06), which is known as the "post-*Prim*" instruction. That instruction states:

"1.06 Deadlocked Jury (Follow Up to 1.05)

In a large proportion of cases absolute certainty cannot be expected nor does the law require it.

If you fail to agree on a verdict the case must be retried. Any future jury must be selected in the same manner as you were chosen. There is no reason to believe that the case would ever be submitted to another jury more competent to decide it, or that the case can be tried any better or more exhaustively than it has been here, or that more or clearer evidence could be produced on behalf of any party.

You should now retire and reconsider the evidence in light of the court's other instructions." *Id.*

The notes on use for IPI Civil (Supp. 2008) No. 1.06 state that the instruction "may be given in the trial court's discretion *only after* the jury has received the IPI 1.05 instruction and remains deadlocked." (Emphasis added.) IPI Civil (Supp. 2008) No. 1.06, Notes on Use. Illinois Pattern Jury Instructions, Civil, No. 1.05, to which the notes on use refer, is known as the *Prim* instruction, and *that* instruction effectuates the minimum standards set forth in *People v. Prim*, 53 Ill. 2d 62 (1972), for providing adequate instruction to deadlocked juries while guarding against coercion. See also Illinois Pattern Jury Instructions, Criminal, No. 26.07 (Supp. 2009) (the criminal counterpart to IPI Civil No. 1.05).

¶ 26    After receiving the "post-*Prim*" instruction in isolation, the jury returned to again acquit on the disorderly-conduct and obstruction charges. It returned guilty verdicts on the criminal-trespass and resisting charges. Upon polling, each juror confirmed the verdict, and the jury was dismissed.

¶ 27    The trial court proceeded to sentencing. The State requested 20 days in jail and 1 year of conditional discharge. It noted that, in 2003, Chai had been convicted of criminal trespass. Defense counsel responded that this was the first she had heard of the prior conviction. Still, she asked for leniency, given that Chai had been in the country for nearly 20 years, had only the one prior conviction (a misdemeanor), was married, and was a graduate of MIT. The court sentenced Chai to 20 days in jail for each conviction, to be served concurrently, and 1 year of conditional discharge.

¶ 28    The trial court denied Chai's posttrial motion. Regarding whether Chai knew he was not welcome at the DMV, the trial court stated that Chai's demeanor at trial showed that he knew he was not welcome but felt entitled to go nevertheless. This appeal followed.

¶ 29                                II. ANALYSIS

¶ 30    The mainstay of Chai's appeal concerns his conviction of criminal trespass to real property. He disputes the sufficiency of the evidence, claims ineffective assistance in regard to trial counsel's agreement to give the "post-*Prim*" instruction in isolation, and contends that the trial court committed plain error when it refused to answer the jury's question regarding the definition of "knowingly." Because we find the evidence insufficient to convict, we do not reach Chai's latter two arguments.

¶ 31    As to his conviction of resisting a peace officer, Chai argues that the trial court erred by declining to answer the jury's question regarding the difference between "resisting" and

"obstructing." We reject this argument and affirm Chai's conviction of resisting a peace officer.

¶ 32                                    A. Criminal Trespass

¶ 33        We first consider the sufficiency of the evidence supporting the criminal-trespass conviction. When reviewing the sufficiency of the evidence, the question is whether the evidence presented at trial, when viewed in the light most favorable to the prosecution, enables any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Cunningham*, 212 Ill. 2d 274, 278-80 (2004). A guilty verdict may be supported by not only the evidence itself, but also any reasonable inference that may be drawn from the evidence. *Cunningham*, 212 Ill. 2d at 279-80. The reviewing court should not substitute its judgment for that of the trier of fact on questions of credibility and the weight to be afforded to the evidence. *People v. Sutherland*, 155 Ill. 2d 1, 17 (1992). At the same time, the reviewing court has a duty to evaluate for itself the reasonableness of a guilty verdict. *Cunningham*, 212 Ill. 2d at 280.

¶ 34        To obtain a conviction for criminal trespass to real property under section 21-3(a)(2) of the Criminal Code of 1961 (the Code), the State had to establish beyond a reasonable doubt that Chai "enter[ed] upon the land of another, after receiving, prior to such entry, notice *from the owner or occupant* that such entry is forbidden." (Emphasis added.) 720 ILCS 5/21-3(a)(2) (West 2010). Although the language of the statute does not expressly set forth a mental-state requirement, case law has established that the "knowlingly" mental state applies to all elements of the offense. *Dutton v. Roo-Mac, Inc.*, 100 Ill. App. 3d 116, 121 (1981) (*dicta*); *People v. Ulatowski*, 54 Ill. App. 3d 893, 896-98 (1977) (under predecessor section 21-3, where a defendant high on LSD remained on the property after being told to leave, the State was required to prove that he *knew* he was told to leave).

¶ 35        Chai argues, and we agree, that the State failed to prove the notice element of the offense. The statute requires that an owner or occupant provide the defendant with notice. Here, according to the State's theory of the case, the police provided the notice. Therefore, the State needed to establish a link between an owner or occupant of the DMV and the police. The State provided no evidence that an owner or occupant authorized or requested the police to provide Chai with notice that he was never to return.

¶ 36        We decline to extend existing case law to allow for notice to be given by a police officer rather than an owner or occupant under the circumstances of this case. See, *e.g.*, *People v. Gudgel*, 183 Ill. App. 3d 881 (1989) (the bar owner called police to help remove a patron); *People v. Thompson*, 56 Ill. App. 3d 557 (1978) (the school superintendent authorized security to remove protesters). Both *Gudgel* and *Thompson* involved trespass prosecutions based on subsection (a)(3), remaining upon the land of another after receiving notice from the owner or occupant to depart. 720 ILCS 5/21-3(a)(3) (West 2010). In each case, the owner or occupant requested the police to provide the defendant(s) with notice to leave the property.

¶ 37        *Gudgel* and *Thompson* allow for the inference that, if the owner or occupant called the police, the owner or occupant implicitly requested the police to provide the defendant with notice to depart. As stated in *Gudgel*, "it would be prudent to summon police and have them remove belligerent patrons rather than attempt[ ] to remove them personally." *Gudgel*, 183 Ill. App. 3d at 884.

¶ 38    However, in the instant case, owner or occupant's summoning police to remove a troublesome patron did not imply a request to tell that patron that he was never to return. Rather, given that the property at issue is a public facility and that Chai had committed the relatively minor "offense" of losing his temper, it is not natural or reasonable to infer that the owner or occupant, by enlisting the help of the police, instructed the police to tell Chai that he was forever banned from the facility. We cannot allow the jury to have made such an inference absent any evidence.

¶ 39    In fact, the small amount of evidence concerning what DMV personnel told the police during the September incident supports the opposite inference. That is, the evidence supports the inference that DMV personnel gave the officers *no* specific instructions concerning future limitations on Chai's access to the facility. For example, Ferguson testified that she called the police to "assist" her. When the officers arrived, she simply "explained to [them] what was going on and let them *** take control of it then." Next, Calafiore testified as a passive and limited observer to the September incident. He stated that "[Chai] was escorted outside by the Lombard police"; "I was inside. I was told afterwards that he was–"; and "[I] inquired as to what they did." He never testified that he even spoke to the police before Chai was removed in September, and therefore no inference can be made that he instructed the officers to notify Chai not to return to the DMV. Finally, McElroy did not testify to any interaction with DMV personnel preceding the September incident. Although he stated that, upon arriving at the facility, he and Ericson "were told that–," defense counsel's hearsay objection was sustained, and the State did not attempt to rephrase the question or revisit that topic.

¶ 40    Comparing the elements of the instant offense to those of a related trespass offense, criminal trespass to state-supported land (720 ILCS 5/21-5(a) (West 2010)) provides further support for the proposition that, to be convicted of criminal trespass to real property, the owner or occupant must, at a minimum, request the police to give the notice on his or her behalf. A person commits that crime when he or she: "enters upon land supported in whole or in part with State funds *** or any building on such land, after receiving, prior to such entry, *notice from the State or its representative* that such entry is forbidden, or remains upon such land or in such building after receiving notice from the State or its representative to depart, and who thereby interferes with another person's lawful use or enjoyment of such building or land." (Emphasis added.) *Id*. In enacting the statute, the legislature anticipated circumstances under which notice in a trespass case may be given directly by a state actor, such as a police officer. That offense contains additional elements not at issue here, such as interfering with another person's lawful use. It is also a Class A, rather than a Class B, misdemeanor. *Id*. The State chose not to charge Chai with criminal trespass to state-supported land, and it is not for us to question whether it should have. The point is that the legislature has specified certain offenses for which notice must come from an owner or occupant and certain offenses for which notice may come directly from a state actor. Here, the State chose to charge Chai with criminal trespass to real property, which requires that the notice come from an owner or occupant of the property.

¶ 41    The jury struggled with the sufficiency of the evidence supporting criminal trespass to real property. A juror repudiated a guilty verdict and the jury sent three deadlock notes to the court, and expressed confusion about whether, to be convicted, Chai must have understood that he was forbidden to enter the property. However, we need not further consider the sufficiency of the evidence, because the State entirely failed to prove an element of the

offense, namely, that Chai received notice from *an owner or occupant* that entry was forbidden. Even in the light most favorable to the State, the evidence does not support a guilty verdict. Accordingly, we reverse Chai's conviction of criminal trespass to real property.

¶ 42 We need not address Chai's remaining challenges to the criminal-trespass conviction, concerning the trial court's deadlock instruction and failure to answer substantively the jury's question about the crime's requisite mental state. However, *in no way* does our decision imply that the trial court's deadlock instruction was proper (*i.e.*, IPI Civil (Supp. 2008) No. 1.06 given in isolation). Similarly, we express no opinion on the trial court's response to the question about the crime's requisite mental state.

¶ 43                                    B. Resisting a Peace Officer

¶ 44 Next, Chai argues that the court erred when it declined to substantively respond to the jury's question regarding the difference between "resisting" and "obstructing." Section 31-1(a) of the Code states: "A person who knowingly *resists or obstructs* the performance by one known to the person to be a peace officer, firefighter, or correctional institution employee of any authorized act within his [or her] official capacity commits a Class A misdemeanor." (Emphasis added.) 720 ILCS 5/31-1(a) (West 2010). The State charged Chai with two different forms of the same offense, resisting a peace officer and obstructing a peace officer. We need concern ourselves with only the "resisting" charge, as that was the only charge that led to a conviction. The jury instructions for resisting stated in part: "Third Proposition: That the defendant knowingly *resisted* the performance by Officer McElroy of an authorized act within his official capacity." (Emphasis added.)

¶ 45 Chai points to the trial court's facetious comment that it did not know the difference between resisting and obstructing either, arguing that, if the question was enough to confuse the court, it warranted an answer. A substantive answer to the jury's question likely would have stated that resisting a peace officer requires a physical act, whereas obstructing an officer "potentially" involves a "broad[er] range of actions." *People v. Lauer*, 273 Ill. App. 3d 469, 474 (1995).

¶ 46 Ordinarily, the trial court may exercise its discretion in answering jury questions. *People v. Falls*, 387 Ill. App. 3d 533, 537-38 (2008). A term that is within the common knowledge of the jury need not be defined by the court. *People v. Sandy*, 188 Ill. App. 3d 833, 842 (1989). However, where the jury demonstrates confusion over the law, the court has a duty to clarify the law. *Falls*, 387 Ill. App. 3d at 537-38. Part of conducting a fundamentally fair trial is ensuring that the jury instructions enable the jury to make a fair determination of the case. See *People v. Ogunsola*, 87 Ill. 2d 216, 222 (1981) (the jury instruction was flawed in that it failed to set forth an element of the charged offense of deceptive practice, *i.e.*, an intent to defraud).

¶ 47 Because Chai's counsel failed to object to the court's conduct at trial, Chai has forfeited the argument. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, under the plain-error doctrine, we may review a forfeited error when either: (1) "the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence"; or (2) "the error is so serious that the defendant was denied a substantial right, and thus a fair trial." *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). The defendant bears the

burden of persuasion under both prongs. *Id*. at 187. For the reasons that follow, Chai has not met his burden.

¶ 48 Here, unlike in *Ogunsola*, there was nothing fundamentally defective about the instructions given to the jury concerning resisting a peace officer. In fact, Chai does not argue otherwise. Additionally, the trial court's failure to inform the jury that resistance requires a physical act could not have prevented the jury from making a fair determination, nor could it otherwise have affected the outcome of the case. That Chai's actions included physical acts–placing his hand on the door and being slow to offer his hands for cuffing–was not disputed in this case.

¶ 49 Chai *admitted* that he committed the physical acts that constituted the resisting charge. His defense was that he did not *intend* to resist the officers. According to him, he placed his hand on the door not to resist the officers, but so that he could turn around to talk to his wife. And, again according to him, he was slow to offer his hands for cuffing not because he wanted to struggle with the officers, but because he remained in a protective posture after the tumble to the ground.

¶ 50 Therefore, as to the resisting charge, the disputed element was Chai's mental state. To the extent that Chai argues that the court should have defined "knowingly" as to the resisting charge, we reject that argument. In the context of that charge, the word "knowingly" was within the common knowledge of the jury.

¶ 51 III. CONCLUSION

¶ 52 For the aforementioned reasons, we reverse Chai's conviction of criminal trespass to real property. We affirm Chai's conviction of resisting a peace officer.

¶ 53 Reversed in part and affirmed in part.