NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241066-U

NO. 4-24-1066

IN THE APPELLATE COURT

FILED
May 22, 2025
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Henry County |
| ANGELA D. BOWMAN, | ) | No. 22CF353 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Colby G. Hathaway, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Doherty and Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court reversed defendant's convictions of theft and criminal trespass
        to real property where the State failed to prove the offenses beyond a reasonable
        doubt.

¶ 2     A jury found defendant, Angela D. Bowman, guilty of theft (720 ILCS 5/16-1(a)(1)

(West 2022)) and criminal trespass to real property (720 ILCS 5/21-3(a)(2) (West 2022)). The trial

court sentenced defendant to 24 months' probation and fines. Defendant appeals. We reverse the

judgment because the State failed to prove the elements of the offenses beyond a reasonable doubt.

¶ 3                                    I. BACKGROUND

¶ 4     Around 9 p.m. on November 16, 2022, defendant and her boyfriend, Jason

Dreifurst, allegedly entered land owned by Werner Restoration and took items out of or near a

dumpster. On December 14, 2022, the State charged defendant by information with two counts of

theft and one count of criminal trespass to real property. One theft count alleged that the value of

the items was between $500 and $10,000, whereas the other count alleged the value was less than $500.

¶ 5        There is no indication in the record that defendant notified the State before trial that she intended to assert mistake of fact as an affirmative defense. See 720 ILCS 5/4-8(a), (d) (West 2022) (providing that a person's mistake as to a matter of fact is an affirmative defense "if it negatives the existence of the mental state which the statute prescribes with respect to an element of the offense"). The matter proceeded to a jury trial.

¶ 6                        A. Defense Counsel's Opening Statement

¶ 7        During his opening statement, defense counsel asserted the evidence would show that defendant and Dreifurst "actually gained permission from employees of Werner Restoration prior to [November 16, 2022,] to come and obtain certain items out of the dumpsters, out of the garbage." Counsel continued: "Where—was the dumpster on [Werner Restoration's] property? Yeah, it was, but I think you're also going to hear testimony that [defendant and Dreifurst] didn't get these items that they had this particular night out of Werner Restoration's dumpster. They were obtained from somewhere else." Counsel also stated:

>        "At the end of the day, I think what you might hear is that not only were [defendant and Dreifurst] given permission to take those items, that doesn't mean they stole them. They're allowed to take them, or if they find them in a dumpster somewhere, that's not the definition of theft."

Referencing the theft count alleging that the stolen property was worth between $500 and $10,000, counsel insinuated that the subject items were discarded and did not have much value.

¶ 8                        B. The State's Evidence

¶ 9        The State presented five witnesses: two police officers and three employees of

- 2 -

Werner Restoration.

¶ 10                                    1. *Tom Wiley*

¶ 11        Sergeant Tom Wiley of the Colona Police Department testified that around 9 p.m. on November 16, 2022, he was dispatched to Werner Restoration's property in response to a complaint that somebody saw "a van and people taking things out of the dumpster near the rear of the building." There had been several similar complaints in the preceding weeks. When Wiley arrived, there was nobody at the dumpsters at the rear of the building, so he quickly drove around the building. Wiley saw a vehicle in a back parking lot that was 50 or 60 yards behind the building, but he did not see anyone there. He then "drove next door to Rock River Electric to speak with the caller," presumably the person who had called the police that night.

¶ 12        Eventually, Wiley returned to Werner Restoration's property and saw a van that he recognized as belonging to defendant's family. As Wiley pulled up, he observed defendant and Dreifurst "walking towards the van out of the dark carrying multiple objects." Although Wiley did not recall if defendant's face was covered, he remembered that she was wearing a stocking hat or a hood, coveralls, and hiking or work boots. Defendant told Wiley that she and Dreifurst were "dumpster-diving" with "permission from one of the employees," whose name was "Bob." At the request of Detective Adam Hull, who had been investigating prior complaints of activity on Werner Restoration's property, Wiley took defendant and Dreifurst to the police station to be interviewed.

¶ 13        During the prosecutor's direct examination of Wiley, the jury saw 1 minute and 16 seconds of Wiley's squad car footage. This portion of the video showed Wiley's vehicle driving on a paved road between a building on his left and what looks like numerous storage garages on his right. After Wiley passed the building on his left, he proceeded straight into an unpaved lot.

Wiley then drove straight into a narrow alley between a building on his left and numerous smaller structures on his right that look like storage sheds. Wiley then entered another unpaved lot, where multiple vehicles were parked at the back, including a van directly in front of Wiley. Beyond this van, somewhere in what appears to be a field, was a parked camper. As Wiley pulled up behind the van, defendant and Dreifurst approached on foot from the field carrying various items. It appears that defendant was carrying some kind of box, a shovel, and a jack that could be used to change a tire. Dreifurst carried a bucket in one hand and another item that is difficult to distinguish in his other hand. Both defendant and Dreifurst were wearing gloves, hoods, and heavy clothing. Defendant had a cover over the lower portion of her face, but Dreifurst did not. Dreifurst opened the trunk of the van as Wiley exited his vehicle and spoke with them. From our review of the video the jury saw, we did not discern any dumpsters or no-trespassing signs.

¶ 14    On cross-examination of Wiley, defense counsel elicited the following points. Wiley mentioned that he did not see anyone by "[t]he front dumpster" when he went past Werner Restoration's property on November 16, 2022. Asked whether Werner Restoration had more than one dumpster, Wiley responded:

> "There was a couple dumpsters like by the *** back of the building, but I believe on the other side around the corner of that, there's like some garage doors where they can enter the building with their trucks and stuff, and then after I talked to them [(presumably defendant and Dreifurst)] and asked where they were coming from, they advised there were several more dumpsters back in that grass lot probably another 50 yards away."

According to Wiley, "the owners" of Werner Restoration advised "us" that those "dumpsters in that back lot 50 yards away" belonged to Werner Restoration. Wiley acknowledged that he did not

see defendant "around any of those dumpsters."

¶ 15 Defense counsel asked Wiley, "The vehicle, when you came upon it, is that Werner Restoration property, that lot?" Wiley responded, "Yes, it is." (Although the form of this question was awkward, we interpret this exchange to mean that Wiley believed that Werner Restoration owned the lot where Wiley encountered defendant's parked van.) Asked how he determined that, Wiley responded, "The owners, and they have their trucks and all their vehicles parked there." Wiley said he believed that the property was fenced off at the sides. The only way to access the place where he "found the vehicle" was to "just drive up from the street." Wiley did not need to pass any fences to "find the vehicle."

¶ 16 Wiley further testified that there were no-trespass signs "[r]ight next to that first dumpster at the back of" Werner Restoration's building. Wiley acknowledged that he located defendant and Dreifurst "at the back lot at their van," not next to this dumpster. However, Wiley volunteered that this dumpster was "where the witness said they were to start with." (It is not clear who "the witness" was, but presumably Wiley was referencing something reported by the person who had called the police that night, who was never identified at trial.)

¶ 17 Wiley explained that when he located defendant and Dreifurst, they had multiple items in their possession that Wiley "instantly" identified "were taken from Werner Restoration." This included (1) a long metal saw stand that had the words "Werner Restoration" stamped on it, (2) a black bag with a small floor jack, (3) a wheel stand for use on a boat or a trailer, and (4) a large paint bucket. Defendant and Dreifurst told Wiley that "they just got [these items] out of their dumpster back there." Although Wiley did not specify which dumpsters, he said that they were on Werner Restoration's property. Wiley was not aware of there being dumpsters right next to Werner Restoration's property in the area of "Scott Family Park." According to Wiley, that park was "still

- 5 -

quite a ways away." When defense counsel asked Wiley whether he knew of "any dumpsters over by where the RVs are and all the campers and such," he responded, "Just the two that they [(presumably defendant and Dreifurst)] said they took the items out of."

¶ 18    After refreshing his recollection with his report, Wiley clarified that defendant did not tell him she had permission from "Bob" that evening. Rather, defendant said "the owner" gave her permission. Nevertheless, according to Wiley, the police had learned from investigating prior complaints that "no one had permission to be back" where he found defendant and Dreifurst. Wiley acknowledged that defendant was taken into custody and charged before the police were able to contact anyone employed by Werner Restoration on November 16, 2022.

¶ 19    On redirect examination, Wiley testified that he made contact with defendant and Dreifurst on Werner Restoration's property. There were no other dumpsters close to that area that did not belong to Werner Restoration. Additionally, based on the particular items that defendant and Dreifurst had in their possession, it made sense to Wiley that those items came from Werner Restoration, not a nearby campground. In order to "hit those dumpsters in the back," in the area where he located defendant and Dreifurst, one would have to drive past a no-trespassing sign on the left by Werner's Restoration's "first dumpster."

¶ 20    2. *Adam Hull*

¶ 21    Detective Hull of the Colona Police Department testified that he obtained a warrant to search the vehicle that defendant drove on the evening of November 16, 2022. When asked what was removed from the vehicle, Hull responded, "There was a DeWalt saw stand, *** a Larin jack, I believe, in a case, a—like a boat wheel, and then there was like a sealant for waterproofing a basement, like a five-gallon jug." The DeWalt saw stand had Werner Restoration's name on it. Without objection from the defense, the trial court admitted those items into evidence as group

- 6 -

exhibit No. 2. This exhibit is not part of the appellate record, and the parties did not introduce pictures of these items.

¶ 22                                          3. *Laura Kittelson*

¶ 23        Laura Kittelson testified that she had been Werner Restoration's accounts payable specialist for 11 ½ years. During that entire time, there was a no-trespassing sign "on the south side of the building as you come into the parking lot." Individuals who were not employed by Werner Restoration were not allowed to take items from the dumpster.

¶ 24        On cross-examination, Kittelson testified that, according to company policy, not even employees of Werner Restoration were allowed to take items out of the dumpster. Although she never gave anyone permission to remove items from the dumpster, she did not know whether anyone else did so. Kittelson knew Doug Streeter, who had been a project manager for Werner Restoration before retiring.

¶ 25        Kittelson further testified that there were no-trespassing signs in two areas of Werner Restoration's property: (1) "at the parking lot as you're coming in to the front of the building where the office people park" and (2) "on the south side of the building." Kittelson stated that Werner Restoration had only one building on the property.

¶ 26        Defense counsel then attempted to make a record of where all the dumpsters were on Werner Restoration's property. He and Kittelson had the following dialogue:

"Q. Okay. Where are all the dumpsters located along Werner Restoration, if you know?

A. On the south side of the building.

Q. Are they up against the building?

A. No.

Q. Okay. Where are they located?

A. Along the back property—or, the side—I don't know how to explain. When you come around the building, they're back by the back part of the parking lot.

Q. Okay. Are they caged in?

A. No.

Q. Are they labeled with Werner Restoration on the dumpsters?

A. No.

Q. Okay. Is there anything by those dumpsters that indicates no trespassing?

A. Just the sign when you're coming into—you have to pass that no trespassing sign to get to the dumpsters.

Q. Okay. And the dumpsters are how far away, 50 to 60 yards?

A. From the building?

Q. Correct.

A. I mean, they're right outside the—I'm not good with distance. I mean, they're not far from the building.

Q. Okay.

A. They're *** reasonably close.

Q. They're pretty close?

A. Yeah. They're not in the back part of the parking lot. They're out the door of the building.

Q. Okay. So they're not way out—

A. No.

Q. –at the far end of the lot, right?

A. No. No.

Q. So there's none that Werner Restoration owns that are way out at the back end of the lot, correct? That's what you just said?

A. No dumpster—no dumpsters at the—no, not way out from the property, no."

¶ 27 On redirect examination, the prosecutor asked Kittelson whether the dumpsters were "located anywhere near the front curb or where you initially enter Werner Restoration's parking lot." Kittelson responded:

"They're *** on the side—on the parking lot where the employees—or, the field people park, so you have to go by the no trespassing sign, you pass that, to get to the far—to the back part—to the side of the parking lot where the dumpsters are."

Kittelson said that this was "a ways back from the public street itself."

¶ 28 4. *Shannon LaPay*

¶ 29 Werner Restoration's finance manager, Shannon LaPay, testified as follows. She was not aware whether employees of the company were allowed to give individuals permission to remove items from the dumpster. Nor was she aware of any company policy regarding taking items near the dumpster. The owners of Werner Restoration were Ken, Teresa, and Brent Werner.

¶ 30 LaPay was aware of items being taken "from near the dumpster" at Werner Restoration on November 16, 2022. After being shown the items constituting group exhibit No. 2, she initially said she recognized them to be tools and other items that were "near our property." However, when asked where those items were located, LaPay said she was not sure about the miter

saw stand, but the other items "were near the dumpster" located on Werner Restoration's property. LaPay replaced all these items with new products, which cost $531.

¶ 31    On cross-examination, LaPay testified that she did not place "any of these items by any dumpsters." However, she saw the jack "near the dumpster." She also saw a paint can near the dumpster, though she did not know whether it was the same one that was found in defendant's van. LaPay explained that it was "typical for people at Werner [Restoration] to store items that are still in use near a dumpster." Although such items "might not be as good as something else," they were available to use after hours or on job sites if needed. LaPay did not know whether the jack or the stand that were part of group exhibit No. 2 worked. She also did not know whether that particular stand "was in a dumpster" or not. She acknowledged that a box in group exhibit No. 2 appeared to be broken.

¶ 32                    5. *Brent Werner*

¶ 33    The president of Werner Restoration, Brent Werner, testified that he was made aware of items belonging to the company being taken on November 16, 2022. He was only "vaguely" familiar with those items, as he was out of town at the time. However, he recognized the miter saw stand in group exhibit No. 2 that bore his company's name. Werner testified that he had never given permission to any nonemployee to take items from or near the company's dumpster.

¶ 34    On cross-examination, Werner testified that Streeter was a former employee of the company. Werner did not recall having a conversation with Streeter about giving people permission to take items out of dumpsters. Werner did not personally place any of the items from group exhibit No. 2 in a dumpster. The only item from group exhibit No. 2 that he recognized as coming from his business was the miter saw stand. He did not know whether any of the items in

group exhibit No. 2 were in a dumpster on November 16, 2022. According to Werner, the dumpsters on Werner Restoration's property were approximately 20 to 25 feet away from the building.

¶ 35                                    C. Motion for a Directed Verdict

¶ 36          Following the State's case in chief, defendant moved for a directed verdict. The trial court granted that motion with respect to one theft count, reasoning that the State failed to prove that the value of the stolen items exceeded $500. The court denied the motion with respect to the other two counts.

¶ 37                                    D. Defendant's Evidence

¶ 38          Dreifurst, who was facing his own theft charge in connection with the events of November 16, 2022, testified on defendant's behalf. He and defendant had known each other for four years and dated for two. According to Dreifurst, on the night of November 16, 2022, he and defendant were out "junking," or "dumpster-diving," when they came into contact with police officers at Colona State Park, which used to be called Indian Trails and adjoined Werner Restoration's lot. Dreifurst claimed that he found a paint can and part of a deer antler in the state park. He had those items in his possession when he encountered Wiley, and he indicated to Wiley that he got them from the dumpster in the state park.

¶ 39          Dreifurst denied being on or taking anything from Werner Restoration's property on November 16, 2022. He explained that he and defendant found the miter saw stand bearing Werner Restoration's name somewhere on the "side of the road." Dreifurst denied ever possessing some of the items in group exhibit No. 2. He said that a certain black box in that exhibit was defendant's own "jack for her vehicle."

¶ 40          Despite denying having entered Werner Restoration's property, Dreifurst also

testified that he believed he had permission to be on Werner Restoration's property. Before being stricken by the court as hearsay, Dreifurst attempted to explain that Streeter gave him permission of some sort on November 16, 2022.

¶ 41                    E. Jury Instructions and Defense Counsel's Closing Argument

¶ 42          Defendant did not tender jury instructions about a mistake-of-fact affirmative defense. Defense counsel likewise did not expressly assert a mistake-of-fact defense in his closing argument. Rather, counsel primarily focused on an argument that the dumpsters defendant and Dreifurst visited did not belong to Werner Restoration. Nevertheless, counsel made several comments that could be construed as being relevant to a mistake-of-fact defense, such as that defendant and Dreifurst reasonably believed they had authority to dumpster-dive where they did on November 16, 2022.

¶ 43                    F. Verdict, Sentencing, and Notice of Appeal

¶ 44          The jury found defendant guilty of both theft and criminal trespass to real property. On the theft count, the trial court sentenced defendant to 24 months' probation and fined her $500. On the criminal-trespass count, the court fined defendant $75. Defendant filed a timely notice of appeal.

¶ 45                              II. ANALYSIS

¶ 46          On appeal, defendant raises three overarching issues, one of which is that the evidence was insufficient to prove her guilt beyond a reasonable doubt. Her sufficiency-of-the-evidence challenge intermingles arguments on two matters: (1) whether the State proved that she possessed the *mens rea* to commit the offenses and (2) whether the State negated her mistake-of-fact affirmative defense. In support of her challenge to the sufficiency of the evidence, defendant submits with her appendix a Google map photograph, which was not introduced at trial, showing

an aerial view of the neighborhood surrounding Werner Restoration's building.

¶ 47    The State responds that the circumstantial evidence and the jury's credibility assessments supported defendant's convictions. The State also objects to defendant submitting a map that was not introduced at trial.

¶ 48    We hold that the State failed to prove the requisite *mens rea* for the offenses. Accordingly, we need not address the other issues defendant raises, including whether defendant properly raised a mistake-of-fact defense that the State was obligated to refute.

¶ 49                          A. The Map

¶ 50    Our supreme court has cautioned that a review of the sufficiency of the evidence "must be limited to evidence actually admitted at trial." *People v. Cline*, 2022 IL 126383, ¶ 32. This court has likewise rejected parties' attempts to submit new evidence for the purpose of providing context for a sufficiency-of-the-evidence challenge. *People v. Wiley*, 2025 IL App (4th) 240186-U, ¶ 45.

¶ 51    Defendant directs our attention to *People v. Clark*, 406 Ill. App. 3d 622, 634 (2010), in which the Second District relied on Google to take judicial notice that a park was north of a certain intersection. Here, by contrast, defendant is not asking us to take judicial notice of a map just to establish that Werner Restoration's property is north or south of some other location—a fact that might seem to be readily provable and beyond reasonable dispute. Rather, defendant relies on the map to draw inferences about other evidence that was introduced at trial. For example, defendant suggests that this map contradicts the trial testimony about which side of the building the dumpsters were on. Defendant also proposes that the map shows that "one can apparently get to the dumpsters without going near Werner [Restoration's] building." Inferences like these are not the type of readily provable and indisputable facts that are amenable to judicial notice. Thus,

we decline to take judicial notice of the proffered map.

¶ 52                                    B. Sufficiency of the Evidence

¶ 53        "When reviewing a challenge to the sufficiency of the evidence, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Harvey*, 2024 IL 129357, ¶ 19. In conducting our review, we must view the evidence in the light most favorable to the prosecution and allow all reasonable inferences from the record in the prosecution's favor. *Harvey*, 2024 IL 129357, ¶ 19. It is not our role to retry the defendant, and we will not substitute our judgment for the jury's on "questions involving the weight of the evidence or the credibility of witnesses." *People v. Jones*, 2023 IL 127810, ¶ 28. Nevertheless, we must overturn a conviction if "the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *Jones*, 2023 IL 127810, ¶ 28. A "reviewing court has a duty to evaluate for itself the reasonableness of a guilty verdict." *People v. Hsiu Yan Chai*, 2014 IL App (2d) 121234, ¶ 33.

¶ 54                                    1. *Criminal Trespass to Real Property*

¶ 55        To sustain the conviction for criminal trespass to real property, the State was required to prove that defendant "enter[ed] upon the land of another, after receiving, prior to the entry, notice from the owner or occupant that the entry is forbidden." 720 ILCS 5/21-3(a)(2) (West 2022). "Although the language of the statute does not expressly set forth a mental-state requirement, case law has established that the 'knowingly' mental state applies to all elements of the offense." *Chai*, 2014 IL App (2d) 121234, ¶ 34. For purposes of this offense, "[a] person has received notice from the owner or occupant" if either (1) the person was "notified personally, either orally or in writing," or (2) "a printed or written notice forbidding such entry has been conspicuously posted or exhibited at the main entrance to the land or the forbidden part thereof."

720 ILCS 5/21-3(b) (West 2022). Alternatively, a landowner may provide notice that entry is prohibited by "placing identifying purple marks on trees or posts around the area to be posted." 720 ILCS 5/21-3(b-5) (West 2022).

¶ 56    Here, the State introduced no evidence that Werner Restoration either placed purple markings around its property or personally notified defendant that she was prohibited from entering its land. Rather, the State attempted to prove that Werner Restoration provided notice to defendant by posting no-trespassing signs. Two of the State's witnesses, Wiley and Kittelson, testified about the presence of such signs on Werner Restoration's property.

¶ 57    On cross-examination, Wiley testified that there was a sign or signs "[r]ight next to that first dumpster at the back of the building." Defense counsel then asked Wiley whether he found defendant and Dreifurst "near that dumpster at the back of the building." In a nonresponsive answer that apparently referenced someone who did not testify at trial, Wiley replied: "That's where the witness said they were to start with." When pressed to answer the question posed, Wiley acknowledged that he found defendant and Dreifurst "at the back lot at their van," not by this first dumpster where there was a no-trespassing sign. On redirect examination, the prosecutor asked Wiley, "And you said there was a no trespassing sign by the first dumpster that's at Werner Restoration?" Wiley responded: "Yes. You would have to pass it as you're coming up the drive as I was. It would be right there to your left."

¶ 58    Kittelson testified on direct examination that there was a no-trespassing sign "on the south side of the building as you come into the parking lot." On cross-examination, she said there was a second no-trespassing sign "at the parking lot as you're coming in to the front of the building where the office people park." When asked whether there was anything by the dumpsters on the south side of the building that "indicates no trespassing," Kittelson responded: "Just the

- 15 -

sign when you're coming into—you have to pass that no trespassing sign to get to the dumpsters."

¶ 59    Viewing this evidence in the light most favorable to the State, we hold that no rational trier of fact could have concluded that defendant knowingly trespassed on Werner Restoration's land. There are multiple glaring defects in the State's case.

¶ 60    The State failed to introduce any photographs depicting Werner Restoration's parcel. Thus, references in the testimony to cardinal directions ("the south side of the building") or even relative locations ("the front of the building where the office people park" or "the first dumpster") lack any context. The jury had no way of determining exactly where the no-trespassing signs were posted on Werner Restoration's property. We note that Wiley's squad car video appeared to show that it was possible to travel to the back lot where Wiley encountered defendant without passing a no-trespassing sign.

¶ 61    Adding to the confusion, the testimony established that Werner Restoration owned only one building, yet Wiley's squad car footage showed multiple buildings and structures. Moreover, it is indiscernible from the evidence how many dumpsters were on Werner Restoration's property. The evidence was also unclear as to whether defendant visited dumpsters that were about 20 to 25 feet from Werner Restoration's building or whether she visited ones much further away. This is an important point because the dumpsters further away may not have belonged to Werner Restoration. Based on the evidence presented, the jury had no way of knowing exactly where Werner Restoration's property lines and dumpsters were located, undermining the State's position that defendant knowingly committed a trespass.

¶ 62    Furthermore, the statute required the State to prove that a no-trespassing sign was "*conspicuously* posted." (Emphasis added.) 720 ILCS 5/21-3(b) (West 2022). The State failed to meet this burden. The record contains no photographs of the signs, nor did the witnesses describe

the signs' sizes or dimensions. The witnesses did not specify whether the signs were obscured by trees or other objects. There was also no evidence about the lighting conditions directly around the signs, which would have been relevant because defendant was accused of entering Werner Restoration's land around 9 p.m. in mid-November. Ultimately, the jury had no idea whether the no-trespassing signs were the size of billboards or Post-It notes or whether the signs would have been visible to a person in defendant's position.

¶ 63        There likewise was no evidence that defendant actually saw the no-trespassing signs. But even if the jury speculated that defendant may have passed a no-trespassing sign at some point as she traversed Werner Restoration's grounds, the State charged defendant with trespass under a theory that she knowingly *entered* prohibited land after receiving notice (720 ILCS 5/21-3(a)(2) (West 2022)), not that she knowingly *remained* on prohibited land after receiving notice to depart (720 ILCS 5/21-3(a)(3) (West 2022)). No witness expressly testified that Werner Restoration posted a no-trespassing sign at the main entrance to its land. See 720 ILCS 5/21-3(b) (West 2022) (requiring a notice to be "conspicuously posted or exhibited at the main entrance to the land or the forbidden part thereof"). Thus, there was no evidence that defendant had notice before entering Werner Restoration's land that she would commit a trespass by entering that land.

¶ 64        For these reasons, even if the jury resolved all credibility questions raised at trial in favor of the State, there was no basis for the jury to conclude that defendant knowingly committed a criminal trespass to real property. The State failed to prove defendant guilty of this offense beyond a reasonable doubt. We therefore reverse the trespass conviction.

¶ 65                                          2. *Theft*

¶ 66        To sustain defendant's theft conviction, the State was required to prove that defendant knowingly obtained or exerted unauthorized control over property of the owner and

intended to deprive the owner permanently of the use or benefit of the property. 720 ILCS 5/16-1(a)(1) (West 2022). The State theorized that defendant stole various items, which were collectively identified at trial as group exhibit No. 2, from inside or near a dumpster on Werner Restoration's property.

¶ 67       We note that the record gives rise to serious doubts as to whether all the items in group exhibit No. 2 came from Werner Restoration's premises. Wiley believed that defendant and Dreifurst visited dumpsters far away from Werner Restoration's building, dumpsters that other testimony showed may not have belonged to Werner Restoration. The State's witnesses also did not expressly identify all the items in group exhibit No. 2 as being Werner Restoration's property. Nevertheless, defendant does not challenge the State's proof that she removed at least one item belonging to Werner Restoration from Werner Restoration's property. Rather, she challenges whether the State proved that she had the requisite *mens rea* to commit a theft when she did so.

¶ 68       Knowledge and intent are rarely subject to proof through direct evidence, and the State may prove *mens rea* with circumstantial evidence. *People v. Leib*, 2022 IL 126645, ¶ 37; *People v. Acklin*, 2020 IL App (4th) 180588, ¶ 21. Here, viewed in the light most favorable to the State, the circumstances do not make it reasonable to infer that defendant knowingly obtained or exerted unauthorized control over the items in group exhibit No. 2 with an intent to deprive Werner Restoration permanently of the use or benefit of those items.

¶ 69       The distinct likelihood that defendant retrieved items from inside a dumpster tends to militate against the conclusion that she intended to commit a theft. *Contra People v. Rebollar*, 2017 IL App (2d) 160761-U, ¶ 22 (in affirming a theft conviction in an unpublished disposition, the court emphasized that the evidence established that the defendant found an item near, rather than inside, a dumpster on commercial property). The unidentified person who called the police

said that he or she observed "people taking things out of the dumpster." Defendant told the police she went "dumpster-diving," which likewise implies that she removed items from inside dumpsters. No witness testified to seeing defendant take the subject items, and there was no surveillance footage introduced depicting this, either. The State also failed to prove exactly where the subject items were located immediately before defendant took them. The only evidence speaking to that issue was LaPay's testimony that she had seen some of the items, or at least similar ones, near a dumpster at some unspecified time.

¶ 70      LaPay also testified that Werner Restoration generally stored items that were not "as good as something else," but which it still intended to keep, near the dumpsters. The notion that a business would intermingle items it intended to keep with its trash might strike some as inherently dubious and contrary to human experience. But even if the jury believed that employees of Werner Restoration subjectively intended to retain items that were stored in or near dumpsters, the record contains no evidence justifying an inference that defendant or anyone else had reason to know that. For example, Werner Restoration did not cage its dumpsters, and there was no evidence that Werner Restoration posted notice that it intended to retain items placed in or near its dumpsters. *Contra People v. Suggs*, 2015 IL App (1st) 130911-U, ¶¶ 5, 20, 23, 25 (unpublished disposition affirming a burglary conviction where the defendant maneuvered his way into a commercial dumpster that was behind a locked gate, enclosed by a roof, and directly accessible from the business's stockroom). Moreover, there was no evidence about the condition of the items that defendant allegedly stole, other than that one item apparently was broken. Testimony that the subject items were in good condition and located in an area of the property where it would have been clear to an observer that the items were not trash might have assisted the State in meeting its burden of proof. See *Rebollar*, 2017 IL App (2d) 160761-U, ¶ 22 (affirming a theft conviction

where the defendant took a "serviceable-looking" large stainless-steel bin that he found "near trucks and other equipment").

¶ 71        So far as the evidence established, to anyone encountering the items constituting group exhibit No. 2 in or near a dumpster, it could only seem that this was discarded and abandoned property that Werner Restoration no longer wished to keep. See Black's Law Dictionary (12th ed. 2024) (defining "abandoned property" as "[p]roperty that the owner voluntarily surrenders, relinquishes, or disclaims"); *Paset v. Old Orchard Bank & Trust Co.*, 62 Ill. App. 3d 534, 537 (1978) (explaining that property is abandoned "where the owner, intending to relinquish all rights to his property, leaves it free to be appropriated by any other person"). Indeed, if defendant had not taken the items constituting group exhibit No. 2, it seems likely from the evidence presented that the items would have been available for sanitation workers to remove.

¶ 72        Under the specific facts adduced at defendant's trial, the presence of no-trespassing signs on Werner Restoration's property does not change our analysis regarding whether the State proved that defendant possessed the requisite *mens rea* to commit a theft. As explained above, the evidence was insufficient to sustain defendant's trespassing conviction, and there was no indication that defendant saw a no-trespassing sign.

¶ 73        The other circumstances likewise lead to the inescapable conclusion that defendant did not have the intent or knowledge necessary to commit a theft. When defendant and Dreifurst encountered Wiley, they did not attempt to flee or discard the items they had gathered. Rather, defendant freely admitted to Wiley that she was "dumpster-diving." In defense of the judgment, the State submits that "this crime occurred late at night" and "defendant was suspiciously clothed with her face covered." Although defendant went dumpster-diving when it was dark outside, it is a stretch to say that 9 p.m. is such an unreasonable hour to salvage discarded items that it inherently

implies a criminal intent. Additionally, the only reasonable inference from the totality of the evidence is that defendant covered her face for protection when she encountered garbage, not that she wanted to obscure her identity as she stole items that Werner Restoration wished to retain.

¶ 74     We hold that no rational trier of fact could have determined that defendant possessed the *mens rea* necessary to sustain a theft conviction. The only reasonable conclusion that can be drawn from the record is that defendant intended to salvage abandoned items, not to deprive Werner Restoration permanently of items that she had reason to know it wished to keep. Accordingly, we reverse the theft conviction.

¶ 75                                III. CONCLUSION

¶ 76     For the reasons stated, we reverse the trial court's judgment.

¶ 77     Reversed.